Vincent F. Gerbino Esquire
BRUNO, GERBINO, SORIANO & AITKEN, LLP
445 Broad Hollow Road, Suite 420
Melville, New York 11747
(631) 390-0010
*Counsel for Plaintiff ALLSTATE Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, and ALLSTATE
FIRE & CASUALTY INSURANCE COMPANY

|  |  |
|---|---|
| Plaintiff, | Docket No.:_____(   ) |

-against-

*The Individual Defendants*
OMAR F. AHMED, M.D.
PHYLLIS GELB, M.D.

*The Provider Defendants*
ENS MEDICAL, P.C.
QUEENS MEDICAL DIAGNOSTIC, P.C.
EAST COAST MEDICAL CARE, P.C.
GARDEN MEDICAL CARE, P.C.
TOWN MEDICAL CARE, P.C.
ATLANTIC MEDICAL CARE, P.C.
NORTHERN MEDICAL CARE, P.C.
TERRACE MEDICAL CARE, P.C.
GO MEDICAL, P.C.
PEGASUS MEDICAL CARE, P.C.
MODERN BROOKLYN MEDICAL P.C.
BOULEVARD MEDICAL CARE, P.C.

*The Unnamed Layperson Owner Defendants*
JOHN AND JANE DOES 1-10

*The Clinic Defendants*
THE ABC CLINICS

**Plaintiff Demands a Trial by Jury**

Defendants.

--------------------------------------------------------------------------X

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................2

PARTIES ...........................................................................................................6

    Plaintiff ........................................................................................................6

    Defendants ...................................................................................................6

JURISDICTION AND VENUE .........................................................................8

AN OVERVIEW OF THE PERTINENT LAW GOVERNING NO-FAULT INSURANCE
REIMBURSEMENT ..........................................................................................9

THE FRAUDULENT SCHEME.......................................................................12

    A.      Summary of the Scheme ......................................................12

             The Multiplicity of Clinic Locations ..................................13

             The Multiple PCs ................................................................14

             The Overlapping Alleged Treatment....................................15

             The Scheme to Conceal ......................................................18

    B.      Ahmed Illegally Purchased Patients at the Clinics ...............19

    C.      The Clinics Sole Objective is the Enabling of No-Fault Insurance Fraud............21

    D.      The Illegal Kickbacks Detailed............................................25

             Bogus Rental Payments ......................................................25

             Other Disguised Kickbacks ................................................26

             Northern Medical ................................................................28

             An Amalgam of Suspect Activity ........................................30

A DEMONSTRATIVE EXAMPLE OF HOW AHMED PRACTICES OPERATE ...................33

THE CLOISTERED EXAMINATIONS UNDER OATH OF AHMED DEMONSTRATE THAT
HE DOES NOT CONTROL THE PROVIDER DEFENDANTS .................................34

    A.      The Prototypical EUO of Modern Brooklyn ......................34

B.    The Filibustering Tour De Force that is the EUO of Garden Medical ...............43

PREARRANGED/PREDETERMINED FRAUDULENT TREATMENT PLAN ....................55

1.    The Fraudulent Charges for Initial Examinations and
      Consultations...................................................................................................55

      a)    The Misrepresentations as to the Length of the
            Examinations...............................................................................57

      b)    Misrepresentations Regarding the Performance of
            Consultations...............................................................................60

      c)    Misrepresentations Regarding the Extent of Medical
            Decision-Making..........................................................................61

      d)    Misrepresentations Regarding "Comprehensive," "Detailed"
            and "complex" Patient Histories....................................................64

2.    The Fraudulent Charges for "Follow-Up" Examinations and
      Consultations Whether Given Initially or in a Follow-Up Setting ............66

3.    The Fraudulent Charges for Electrodiagnostic Testing ...........................67

      a)    The Nervous System and Electrodiagnostic Testing.....................67

      b)    The False Charges for NCV Tests .................................................68

      c)    The Fraudulent Charges for EMG Tests .......................................70

4.    The Fraudulent Charges for VNG Tests....................................................72

      a)    Legitimate Uses for VNG Tests....................................................72

      b)    The Fraudulent VNG Test Charges ...............................................74

5.    The Fraudulent Charges for Transcranial Doppler Testing.......................75

6.    The Fraudulent Charges for "Extracorporeal Shockwave Therapy ..........76

      a)    Overview of the ESWT Scheme ..................................................76

      b)    The ESWT Defendants Misrepresent that Ahmed and Gelb
            Perform the Treatment ..................................................................79

      c)    The ESWT Was Not Medically Necessary....................................82

      d)    The Fraudulent Charging Scheme ................................................85

7.  The Fraudulent "Outcome Assessment Testing" .......................................85

8.  The Fraudulent Billing for Independent Contractor Services...................87

9.  The Defendants Fraudulent Billing for Services Rendered by Unsupervised Physician Assistants............................................................90

THE FRAUDULENT BILLING DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED TO ALLSTATE ................................................................................90

DEFENDANTS' FRAUDULENT CONCEALMENT AND ALLSTATE'S  JUSTIFIABLE RELIANCE ..............................................................................................................91

FIRST CAUSE OF ACTION

Against all Defendants (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202) .............92

SECOND CAUSE OF ACTION

Against Ahmed  (Violation of RICO, 18 U.S.C. § 1962(c)) ............................................93

THIRD CAUSE OF ACTION

Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) .....................................................................................................................95

FOURTH CAUSE OF ACTION

Against Ahmed and ENS Medical (Common Law Fraud) ...............................................97

FIFTH CAUSE OF ACTION

Against Ahmed and ENS Medical (Unjust Enrichment) ..................................................98

SIXTH CAUSE OF ACTION

Against John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) .99

SEVENTH CAUSE OF ACTION

Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c))  ..........................................100

EIGHTH CAUSE OF ACTION

Against Ahmed and John and Jane and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) ............................................................................................................102

NINTH CAUSE OF ACTION

    Against Ahmed and Queens Medical (Common Law Fraud) ........................................103

TENTH CAUSE OF ACTION

    Against Ahmed and Queens Medical (Unjust Enrichment) ...........................................105

ELEVENTH CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting
    Fraud) ..................................................................................................................................105

TWELFTH CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................106

THIRTEENTH CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. §
    1962(d))................................................................................................................................108

FOURTEENTH CAUSE OF ACTION

    Against Ahmed and ECMC (Common Law Fraud) ......................................................110

FIFTEENTH CAUSE OF ACTION

    Against Ahmed and ECMC (Unjust Enrichment) ...........................................................11

SIXTEENTH CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting
    Fraud)..................................................................................................................................112

SEVENTEENTH CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................113

EIGHTEENTH CAUSE OF ACTON

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. §
    1962(d)) ...............................................................................................................................115

NINETEENTH CAUSE OF ACTION

    Against Ahmed and Garden Medical (Common Law Fraud) ........................................117

TWENTIETH CAUSE OF ACTION

    Against Ahmed and Garden Medical (Unjust Enrichment) ............................................118

TWENTY-FIRST CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) ...................................................................................................119

TWENTY-SECOND CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................120

TWENTY-THIRD CAUSE OF ACTION

    Against Ahmed, Gelb, and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) ...........................................................................................122

TWENTY-FOURTH CAUSE OF ACTION

    Against Ahmed and Town Medical (Common Law Fraud) ...........................................124

TWENTY-FIFTH CAUSE OF ACTION

    Against Ahmed, Gelb, and Town Medical (Unjust Enrichment) ...................................125

TWENTY-SIXTH CAUSE OF ACTION

    Against Gelb, John and Jane Doe Defendants and the ABC Clinics (Aiding and Abetting Fraud) ...................................................................................................126

TWENTY-SEVENTH CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................127

TWENTY-EIGHTH CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) ...................................................................................................129

TWENTY-NINTH CAUSE OF ACTION

    Against Ahmed and Atlantic Medical (Common Law Fraud) .......................................131

THIRTIETH CAUSE OF ACTION

    Against Ahmed and Atlantic Medical (Unjust Enrichment) ..........................................132

THIRTY-FIRST CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) ...................................................................................................133

THIRTY-SECOND CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................134

THIRTY-THIRD CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) .................................................................................................................................136

THIRTY-FOURTH CAUSE OF ACTION

    Against Ahmed and Modern Brooklyn (Common Law Fraud) ....................................138

THIRTY-FIFTH CAUSE OF ACTION

    Against Ahmed and Modern Brooklyn (Unjust Enrichment) ........................................139

THIRTY-SIXTH CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) ..................................................................................................................................140

THIRTY-SEVENTH CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................141

THIRTY-EIGTH CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) .................................................................................................................................143

THIRTY-NINTH CAUSE OF ACTION

    Against Ahmed and Terrace Medical (Common Law Fraud) .......................................144

FORTIETH CAUSE OF ACTION

    Against Ahmed and Terrace Medical (Unjust Enrichment) ...........................................145

FORTY-FIRST CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) ..................................................................................................................................146

FORTY-SECOND CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................147

FORTY-THIRD CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) ................................................................................................................149

FORTY-FOURTH CAUSE OF ACTION

    Against Ahmed and Pegasus Medical (Common Law Fraud) .......................................151

FORTY-FIFTH CAUSE OF ACTION

    Against Ahmed and Pegasus Medical (Unjust Enrichment) ..........................................152

FORTY-SIXTH CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud ...............................................................................................................................153

FORTY-SEVENTH CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................154

FORTY-EIGHTH CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) ................................................................................................................156

FORTY-NINTH CAUSE OF ACTION

    Against Ahmed and Go Medical (Common Law Fraud) ...............................................157

FIFTIETH CAUSE OF ACTION

    Against Ahmed and Go Medical (Unjust Enrichment) ..................................................159

FIFTY-FIRST CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) .............................................................................................................159

FIFTY-SECOND CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................160

FIFTY-THIRD CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) ................................................................................................................162

FIFTY-FOURTH CAUSE OF ACTION

    Against Ahmed and Northern Medical (Common Law Fraud) ......................................164

FIFTY-FIFTH CAUSE OF ACTION

    Against Ahmed and Northern Medical (Unjust Enrichment...........................................165

FIFTY-SIXTH CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) .........................................................................................................................166

FIFTY-SEVENTH CAUSE OF ACTION

    Against Ahmed (Violation of RICO, 18 U.S.C. § 1962(c)) ...........................................167

FIFTY-EIGHTH CAUSE OF ACTION

    Against Ahmed and John and Jane Doe Defendants (Violation of RICO, 18 U.S.C. § 1962(d)) .......................................................................................................................169

FIFTY-NINTH CAUSE OF ACTION

    Against Ahmed and Boulevard Medical (Common Law Fraud) ....................................170

SIXTIETH CAUSE OF ACTION

    Against Ahmed and Boulevard Medical (Unjust Enrichment) .......................................172

SIXTY-FIRST CAUSE OF ACTION

    Against the John and Jane Doe Defendants and ABC Clinics (Aiding and Abetting Fraud) .........................................................................................................................173

JURY DEMAND .......................................................................................................................174

Plaintiffs, ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, and ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, (hereinafter referred to as "ALLSTATE"), by and through its attorney, BRUNO, GERBINO, SORIANO & AITKEN, LLP, as and for their Complaint against the defendants in this action, hereby alleges as follows:

**INTRODUCTION**

1.      This action seeks to recover more than $1,931,060.00 that the Defendants wrongfully obtained from ALLSTATE by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, untried, investigational, excessive, fictitious, and otherwise non-reimbursable healthcare services, including, but not limited to, contrived Patient examinations, videonystagmus ("VNG") testing, transcranial doppler tests ("TDT"), extracorporeal shockwave therapy ("ESWT"), nerve conduction velocity ("NCV") testing,  electromyography ("EMG") studies, and Outcome Assessment Testing (collectively, the "Fraudulent Services"), which allegedly were provided to New York automobile accident Patients that were insured and/or were otherwise eligible for no-fault benefits (hereinafter "Patients") through ALLSTATE.

2.      Defendant Omar F. Ahmed, M.D. ("Ahmed") is a physician licensed to practice in New York who claims to own a series of medical professional corporations, including Defendants ENS Medical, P.C., Queens Medical Diagnostic, P.C., East Coast Medical Care, P.C., Garden Medical Care, P.C., Town Medical Care, P.C., Northern Medical Care, P.C., Terrace Medical Care, P.C., Go Medical, P.C., Pegasus Medical Care, P.C., Atlantic Medical Care, P.C., Modern Brooklyn Medical, P.C., and Boulevard Medical, P.C. (collectively, the "Provider Defendants"), that have

billed ALLSTATE and other New York automobile insurers for the Fraudulent Services as part of scheme to abuse and exploit New York's no-fault insurance system.

3.     Defendant Phyllis Gelb, M.D. ("Gelb") is a physician licensed to practice in New York.  She is the purported owner of Town Medical, P.C. and is listed on virtually all of Town Medical, P.C.'s billing as the "Treating Provider." However, Gelb is the sham owner who rarely personally treated any Patients. Gelb served to conceal Ahmed's true ownership and control of Town Medical and the provision of the Fraudulent Services, which services were virtually always performed by independent contractors, to wit, unsupervised physician assistants or "technicians" – in violation of New York law.

4.     Defendants, including John and Jane Doe Defendants 1-10, (sometimes referred to as "Doe Defendants") perpetrated the fraudulent scheme using illegal referral and kickback arrangements with the ABC Clinics (sometimes referred to as "Clinics") enabled through, among other things, payments to shell companies, that permitted the Provider Defendants to access automobile accident victims, fraudulently bill ALLSTATE for $3,217,723.00 of dollars of Fraudulent Services, and illegally misuse the Patients for financial gain.

5.     ALLSTATE seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement for any pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat and benefit the Patients;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided to inflate the charges submitted to ALLSTATE;

3

(iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons that controlled the Provider Defendants who were not licensed to render healthcare services and by illegal kickback arrangements;

(iv)    in many cases, the Fraudulent Services – to the extent provided at all – were provided by independent contractors rather than by employees of the Provider Defendants; and

(v)    with respect to East Coast Medical Care, P.C., Queens Medical Diagnostic, P.C., Garden Medical Care, P.C., and Town Medical, P.C., specifically, the Fraudulent Services were performed in violation of material licensing laws, as many of their respective Fraudulent Services were performed by unsupervised physician assistants, and therefore were non-reimbursable.

6.    The Defendants are categorized as follows:

(i)    Defendant Ahmed is a physician licensed to practice medicine in the State of New York.  He purports to own the Provider Defendants and asserts that he performs some of the services Allstate alleges are Fraudulent Services.

(ii)    Defendants ENS Medical, P.C. ("ENS Medical"), Queens Medical Diagnostic, P.C. ("Queens Medical"), East Coast Medical Care, P.C. ("ECMC"), Garden Medical Care, P.C. ("Garden Medical"), Town Medical Care, P.C. ("Town Medical"), Atlantic Medical Care, P.C. ("Atlantic Medical"), Northern Medical Care, P.C. ("Northern Medical"), Terrace Medical Care, P.C. ("Terrace Medical"), Go Medical, P.C. ("Go Medical"), Pegasus Medical Care, P.C. ("Pegasus Medical"), Modern Brooklyn Medical P.C. ("Modern Brooklyn"), Boulevard Medical, P.C. ("Boulevard Medical") (collectively the "Provider Defendants") are New York medical professional corporations, through which the Fraudulent Services were performed and billed to New York automobile insurance companies, including ALLSTATE.

(iii)    Defendant Phyllis Gelb, M.D. is a physician licensed to practice medicine in the State of New York. She is the purported owner of Town Medical and asserts that she performed virtually all the services at Town Medical that Allstate alleges were Fraudulent Services.

(iv)    John and Jane Doe Defendants 1-10 ("Doe Defendants") are individuals and/or entities who participated in the fraudulent scheme perpetrated against ALLSTATE by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, "brokering" or "controlling" access to Patients in exchange for illegal kickback payments, and/or

4

spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine Patient care.

(v)     The ABC Clinics ("Clinics") are the medical facilities that house and provide Patients to Ahmed and the Provider Defendants in exchange for kickbacks.

7.      The Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – if provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Patients who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; (iii) the Fraudulent Services were provided – if provided at all – pursuant to the dictates of unlicensed laypersons that controlled the Provider Defendants; (iv) Patients were procured through illegal kickbacks; and (v) in many cases, the Fraudulent Services – if provided at all – were provided by independent contractors, rather than by Ahmed, Gelb, or employees of the Provider Defendants. In addition, Defendants knew that Queens Medical, ECMC, Garden Medical, Town Medical, and Atlantic Medical rendered many of their respective Fraudulent Services through unsupervised physician assistants, in violation of material licensing laws.

8.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to ALLSTATE.

9.      The charts annexed hereto as Exhibits 1 through 11 set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to ALLSTATE.

10.     The Defendants' fraudulent scheme began in 2014 and has continued uninterrupted through the present day, as the Provider Defendants continue to seek collection on pending charges for the Fraudulent Services.

11.     As a result of Defendants' fraudulent scheme, ALLSTATE has incurred damages of more than $1,931,060.10 not including attorney fees and investigation costs herewith.

## PARTIES

### A.     PLAINTIFF

12.     ALLSTATE is a foreign corporation that is duly authorized to engage in and conduct business in the State of New York.

### B.     DEFENDANTS

13.     Defendant Ahmed resides in and is a citizen of New York. Ahmed was licensed to practice medicine in New York on June 15, 2006, and holds himself out as the owner of the Provider Defendants except Town Medical. Each of the Provider Defendants has been used by Ahmed, with the help of the Doe Defendants and the ABC Clinics, to submit fraudulent billing to ALLSTATE. Ahmed was named as a defendant in no-fault insurance fraud lawsuits credibly alleging, among other things, that Ahmed paid illegal kickbacks in exchange for Patient referrals and provided healthcare services pursuant to a pre-determined treatment protocol. *See GEICO, et al., v. Northern Medical Care, P.C., et al.*, 20-cv-01214 (E.D.N.Y.) *See also, GEICO, et al., v. ENS Medical, P.C. et. al.*, 22-cv-01679 (E.D.N.Y.)

14.     Defendant Gelb resides in and is a citizen of New York. Gelb was licensed to practice medicine in New York on February 23, 1996, and is the purported owner of Town Medical. She is listed on virtually all of Town Medical's billings as the "Treating Provider."

6

15.     Defendant Northern Medical is a New York professional corporation incorporated on August 6, 2014, with its principal place of business in New York.  Defendant Omar is the

16.     Defendant Modern Brooklyn is a New York professional corporation incorporated on May 24, 2016, with its principal place of business in New York.

17.     Defendant Queens Medical is a New York professional corporation incorporated on or about July 7, 2016, with its principal place of business in New York.

18.     Defendant Atlantic Medical is a New York professional corporation incorporated on April 17, 2017, with its principal place of business in New York.

19.     Defendant ENS Medical is a New York professional corporation incorporated on or about April 21, 2017, with its principal place of business in New York.

20.     Defendant ECMC is a New York professional corporation incorporated on or about January 3, 2020, with its principal place of business in New York.

21.     Defendant Town Medical is a New York professional corporation incorporated on or about August 13, 2020, with its principal place of business in New York.

22.     Defendant Garden Medical is a New York professional corporation incorporated on or about April 12, 2021, with its principal place of business in New York.

23.     Defendant Terrace Medical is a New York professional corporation incorporated on April 16, 2021, with its principal place of business in New York.

24.     Defendant Pegasus Medical is a New York professional corporation incorporated on June 28, 2021, with its principal place of business in New York.

25.     Defendant GO Medical is a New York professional corporation incorporated on August 12, 2021, with its principal place of business in New York.

7

26.     Defendant Boulevard Medical, P.C. is a New York professional corporation incorporated on April 25, 1996, with its principal place of business in New York.

27.     As is readily apparent the scheme is accelerating as Ahmed creates new entities in an effort to escape detection and to increase the bills for fraudulent services.

28.     The John and Jane Doe Defendants reside in and are citizens of New York and surrounding states.  The Doe Defendants are laypersons, presently not named, but some of whom will be openly discussed herein, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, selling access to Patients in exchange for illegal kickback payments, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine Patient care.  They illegally control the Provider Defendants.

29.     The ABC Clinic Defendants are multidisciplinary medical facilities located throughout the New York City metropolitan area that broker Patients to the Provider Defendants in exchange for monetary kickbacks and referrals. Many will be mentioned herein.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action under *28 U.S.C. §1332(a)(1)* because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

31.     Pursuant to *28 U.S.C. § 1331*, this Court also has jurisdiction over the claims brought under *18 U.S.C. §§ 1961 et seq.* (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

32.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to *28 U.S.C. § 1367*.

33.     Venue in this District is appropriate pursuant to *28 U.S.C. § 1391(b)(1)*, as the Eastern District of New York is the District where one or more of the Defendants reside.

34.     Venue in this District is appropriate pursuant to *28 U.S.C. § 1391(b)(2)*, because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## AN OVERVIEW OF THE PERTINENT LAW GOVERNING NO-FAULT INSURANCE REIMBURSEMENT

35.     ALLSTATE underwrites automobile insurance in New York and New Jersey.

36.     New York's no-fault insurance laws are designed to ensure that injured casualties of motor vehicle accidents have an efficient means to receive the healthcare that they need.

37.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (*N.Y. Ins. Law §§ 5101, et seq.*) and the regulations promulgated pursuant thereto (*11 N.Y.C.R.R. §§ 65, et seq.*), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Patients.

38.     In New York, mandatory PIP Benefits include up to $50,000.00 per Patient for necessary expenses that are incurred for healthcare goods and services.

39.     In New York, an insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those goods and services.

40.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to the insurance company and receive payment for medically necessary services, using the claim form required by the Department of Financial Services (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

9

41.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

42.     Pursuant to the New York no-fault insurance laws, healthcare providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

43.     The implementing regulation adopted by the New York Superintendent of Insurance, _11 N.Y.C.R.R. § 65-3.16(a)(l2)_ states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(l) of the Insurance Law if the provider fails to meet _any_ applicable New York State or local licensing requirement necessary to perform such service in New York or meet _any_ applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

44.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may **_not_**: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable, derive economic benefit from professional healthcare services.

45.     New York law prohibits licensed healthcare providers from paying or accepting compensation in exchange for Patient referrals. See, *New York Education Law §§ 6509-a; 6531*. *Public Health Law §238*.  Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation for it to be lawfully licensed. *See*, *N.Y. Business Corporation Law§ 1507.*

46.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive PIP Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful compensation in exchange for Patient referrals.

47.     In *State Farm Mut. Auto. Ins. Co. v. Mallela,* 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  *See Carothers v. Progressive Ins. Co*., 33 N.Y.3d 389, 2019 N.Y. Slip Op. 4643 *1 (2019).

48.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

49.     When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the fees were not excessive.

11

50.     Pursuant to *New York Insurance Law § 403*, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to ALLSTATE, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## THE FRAUDULENT SCHEME

### A.    Summary of the Scheme

51.     Beginning in 2014, and continuing through the present day, Ahmed, and the Provider Defendants, with the aid of the Doe Defendants and the Clinic Defendants, engineered and executed a complex scheme in which the Provider Defendants were used to bill ALLSTATE and other New York automobile insurers millions of dollars for medically unnecessary, untried/experimental, excessive, deceptive, illusory and/or otherwise non-reimbursable healthcare services.

52.     The Fraudulent Services billed under the names of the Provider Defendants were not medically necessary and were provided – if provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide beneficial medically necessary treatment to the Patients, and were further provided pursuant to the directives and commands of unlicensed laypersons not permitted by law to render, supervise, prescribe or control the provision of healthcare services.

53.     Ahmed never personally performed any services on behalf of the Provider Defendants. Instead, the vast majority, if not all, of the Fraudulent Services were performed by independent contractors, in violation of the No-Fault regulations and New York law.

12

**The Multiplicity of Clinic Locations**

54.    All but two of the Provider Defendants were mobile and purportedly provided their services from various healthcare clinics that offered no-fault services.  Ahmed operated these traveling entities at these no-fault clinics primarily located in Brooklyn, Queens, and Bronx.

55.    As a result of unlawful kickback and referral arrangements, the Provider Defendants, over an approximate 8-year plus time period, obtained Patients and alleged to have provided Services that were fraudulent, if provided at all, from a total of *over* 67 different No-Fault medical clinic locations.  Herein is a partial list of the ABC clinic locations:

• 102-34 Atlantic Avenue, Ozone Park;
• 1050 Old Nichols Road, Islandia;
• 105-10 Flatlands Avenue, Brooklyn;
• 1065 Old Country Road, Westbury;
• 107-48 Guy R Brewer Boulevard, Jamaica;
• 11 East Hawthorn Avenue, Valley Stream;
• 1122 Coney Island Avenue, Brooklyn;
• 135 Eastern Parkway, Brooklyn;
• 14 Bruckner Boulevard, Bronx;
• 149-36 Northern Boulevard, Flushing;
• 15-30 Bedford Avenue, Brooklyn;
• 164-10 Crocheron Avenue, Flushing;
• 1647 Macombs Road, Bronx;
• 1655 Richmond Avenue, Staten Island;
• 1767 Southern Boulevard, Bronx;
• 179 Great Neck Road, West Babylon;
• 1799 Brentwood Road, Brentwood;
• 1800A New York Avenue, Huntington Station;
• 1894 Eastchester Road, Bronx;
• 1975 Linden Boulevard, Elmont;
• 204-12 Hillside Avenue, Hollis;
• 21 Washington Avenue, Brentwood;
• 214-29 Jamaica Avenue, Queens Village;
• 2148 Flatbush Avenue, Brooklyn;
• 221-05 Jamaica Avenue, Queens Village;
• 2273 65th Street, Brooklyn;
• 2426 Eastchester Road, Bronx;
• 2488 Grand Concourse, Bronx;
• 2598 Third Avenue, Bronx;

13

- 2799 Route 112, Medford;
- 300 Hempstead Turnpike, West Hempstead;
- 3041 Avenue U, Brooklyn;
- 3060 East Tremont Avenue, Bronx;
- 3250 Westchester Avenue, Bronx;
- 33-06 88th Street, Jackson Heights;
- 332 East 149th Street, Bronx;
- 3432 East Tremont Avenue, Bronx;
- 360A West Merrick Road, Valley Stream;
- 37-03 92nd Street, Jackson Heights;
- 37 Smith Street, Freeport;
- 4011 Warren Street, Elmhurst;
- 4014A Boston Road, Bronx;
- 409 Rockaway Avenue, Brooklyn;
- 4226A Third Avenue, Bronx;
- 4250 White Plains Road, Bronx;
- 4626 White Plains Road, Bronx;
- 488 Lafayette Avenue, Brooklyn;
- 507 Westchester Avenue, Bronx;
- 513 Church Avenue, Brooklyn;
- 535 Broadhollow Road, Melville;
- 5414 Avenue N, Brooklyn;
- 560 Prospect Avenue, Bronx;
- 60-40 82nd Street, Middle Village;
- 607 Westchester Avenue, Bronx;
- 615 Seneca Avenue, Ridgewood;
- 62-69 99th Street, Rego Park;
- 632 Utica Avenue, Brooklyn;
- 69-37 Myrtle Avenue, Glendale;
- 788 Southern Boulevard, Bronx;
- 79-45 Metropolitan Avenue, Middle Village;
- 820 Hempstead Turnpike, Franklin Square;
- 82-25 Queens Boulevard, Woodside;
- 89-25 130th Street, Richmond Hill;
- 900 East Tremont Avenue, Bronx;
- 900 Route 109, Lindenhurst;
- 90-16 Sutphin Boulevard, Jamaica;
- 90-46 Corona Avenue, Elmhurst; and
- 94-13 Flatlands Avenue, Brooklyn.

**The Multiple PCs**

56.     Ahmed and his layperson handlers sought to operate the Provider Defendants in a manner that maximized financial gain while concealing the true extent of the fraudulent scheme. This was accomplished through the creation of multiple PC entities that provide the same services.

57.     For example, seven of the eleven Ahmed P.C.s that were named as Defendants in this case provide Electrodiagnostic Testing: Atlantic Medical; Queens Medical; ENS Medical; Terrace Medical; Boulevard Medical, Northern Medical; and Modern Brooklyn. The obvious question is – does Ahmed need seven P.C.s that provide Electrodiagnostic Testing when only one professional entity would suffice.  Ahmed could argue that Modern Brooklyn and Northern Medical were located at one location each.  However Atlantic Medical, Queens Medical, Terrace Medical, Boulevard Medical, and ENS Medical operate on an itinerant basis from multiple locations throughout the New York Metropolitan area sometimes with confounding anomalies.

**The Overlapping Alleged Treatment**

58.     Patient K.W. received multiple treatment modalities at a clinic location wherein Ahmed P.C.s frequently appear.  On November 20, 2020, Ahmed's Atlantic Medical purported to perform an office consultation upon K.W. under CPT code 99243 with a charge of $248.34 dollars (see *infra* for the examination/consultation fraud).  That same day Atlantic purported to perform a needle electromyography ("EMG") upon K.W. with a charge of $202.25.  Simultaneously, Atlantic purported to perform nerve conduction studies ("NCV") upon K.W. with a charge of $566.45 (see *infra* for a detailed description of the electrodiagnostic testing fraud)

59.     Meanwhile at the same above location – with the same above Patient K.W. – Ahmed's ENS Medical purported to perform another office consultation upon K.W. on February 17, 2021, under CPT code 99244 with a charge of $324.69.   That same day ENS Medical

15

performed another EMG upon K.W. with a charge of $243.32.  In addition, on that same day ENS Medical purportedly performed another NCV upon K.W. with a purported charge of $566.45.

60.     Meanwhile Ahmed P.C. ECMC purported to provide K.W. with ESWT treatments on October 12, 2020 ($700.39 charge), February 8, 2021 ($3,499.90 charge), and May 17, 2021 ($1,400.78 charge) at the same location.  In addition to the ESWT treatments, Ahmed's ECMC purported to provide K.W. with yet more examinations: February 8, 2021, under code 99212 for $137.64 and May 17, 2021, under code 99212 for $68.82.

61.     The above maneuverings allowed Ahmed and his handlers to submit multiple bills to ALLSTATE under differing entity names and TIN numbers for the same Patient thereby attempting to evade scrutiny.

62.     Likewise at another clinic location frequented by Ahmed practices Atlantic Medical Care purported to give Patient S.D. EMG testing on December 10, 2020 ($404.50 charge) with a consultation/examination billed under CPT code 99243 for a charge of $248.34.  Meanwhile only a month prior on November 12, 2020, Ahmed's ENS purported to provide S.D. with EMG testing ($243.32 charge); NCV testing ($566.45 charge) and another consultation/examination billed under CPT code 99244 for a charge of $324.69.

63.     The same is true of Patient K.M. for yet another clinic location frequented by Ahmed. On December 23, 2020, Atlantic Medical purported to provide K.M. with a consultation/examination under CPT code 99243 with a charge of $248.34.  That same day Atlantic purported to provide EMG testing ($202.25 charge) and NCV testing ($566.45 charge).  A scant three weeks later Ahmed's ENS Medical purported to provide yet another examination under CPT code 99243 to K.M. at the same location with a charge of $248.34.  That same day and place Ahmed's ENS Medical purported to provide yet another round of EMG testing ($202.25 charge)

16

and NCV testing ($566.45 charge) using the same exact codes as the prior EMG testing and NCV testing to bill.

64.     In addition, Patient K.O. received treatment at yet another clinic location frequented by Ahmed. On December 3, 2020, Atlantic Medical purported to provide K.O. with a consultation/examination billing under CPT code 99243 with a charge of $248.34.  That same day and place Atlantic purported to provide EMG testing with a charge of $404.50 and NCV testing with a charge of $566.45.  Shortly thereafter on January 28, 2021, at the same location ENS Medical purported to provided K.O. with another consultation under CPT code 99243 with a charge of $248.34 as well as EMG testing with a charge of $404.50 and NCV testing with a charge of $566.45 using the same codes as Atlantic Medical.

65.     The overlap between Ahmed PCs that purport to provide Electrodiagnostic testing is pervasive and is a ploy to administer multiple testing and examinations to the same Patients thereby duplicating billing that is medically unnecessary.

66.     Ahmed has four P.C.s that specialize in providing purported ESWT on a roving basis at several clinic locations: ECMC; Go Medical; Garden Medical; and Town Medical (with whom Ahmed and his handlers add another layer of subterfuge by claiming that Defendant Gelb is the true owner).  Ahmed and his handlers only need one P.C. but they utilize four to avoid detection. Indeed, these ESWT PCs appear at the same clinic with other Ahmed Provider Defendants treating the same Patients and purporting to provide multiple examinations/consultations.

67.     Further Ahmed has two PCs that purport to provide VNG and TDT testing: Pegasus Medical and Queens Medical on a wayfaring basis from numerous clinic locations. They often

appear with other Ahmed Provider Defendants treating the same Patients and purporting to provide multiple examinations/consultations.

**The Scheme to Conceal**

68.     In order to execute the scheme, Ahmed and the Provider Defendants engaged in actions that concealed its true nature and extent. For example, the bills submitted by ECMC, Queens Medical, and Garden Medical typically represented that Ahmed was the treating provider when many of the Fraudulent Services were performed by unsupervised physician assistants.

69.     Further, the bills submitted by Town Medical represented that Gelb was both the treating provider and the owner of Town Medical. Town Medical's services were virtually always rendered by independent contractors – unsupervised physician assistants – and Town Medical was, and always has been, owned, controlled, and operated by Ahmed and his Doe Defendant handlers.

70.     Ahmed is listed as the incorporator on Town Medical's certificate of incorporation and is registered as Town Medical's owner with the New York State Education Department's Office of the Professions.

71.     A Clinic provided an insurer with the email address of "Cristina Prince" as the contact for Town Medical. During the EUO of ENS Medical, Ahmed identified Cristina Prince as his administrative assistant.  During an EUO of Garden Medical Ahmed also identified Cristina Prince as his administrative assistant who handles the scheduling of all Nurse Practitioners and Physicians Assistants, handles the paperwork generated by Garden Medical daily, submits paperwork to the law firms that do the billing and follows up on any missing documentation.

72.     In order to conceal his association with Town Medical, Ahmed enlisted Gelb to serve as its sham owner so that Town Medical could represent on its billing to no-fault insurance carriers, including ALLSTATE, that Gelb was the owner.

18

73.     Gelb allowed Ahmed to use her medical license and to list her as the owner on Town Medical's billing in exchange for financial compensation, even though Gelb knew that she would not have any beneficial ownership or control over Town Medical – and knew that Town Medical was going to be used to submit fraudulent billing to insurers.

**B.     Ahmed Illegally Purchased Patients at the Clinics**

74.     Ahmed and the handlers entered illegal kickback/referral arrangements with the ABC Clinics who provided him with Patients in exchange for kickbacks.

75.     Ahmed did not have his own Patients and did nothing to create a Patient base.

76.     Ahmed did not market the existence of any of the Provider Defendants or the Fraudulent Services to the public.

77.     Ahmed did not advertise for Patients, did not maintain any website, and never sought to build name recognition or make any legitimate efforts of his own to attract Patients on behalf of any of the Provider Defendants. Ahmed himself was adamant about this in his February 10, 2023, Examination Under Oath:

> I talked about this. I don't know why you keep asking the question. There is no marketing, zero. That means everything. [no website, social media, advertising, even signs at the office – nothing]
>
> ***
>
> Q. How do the Patients know that you are there?
>
> A. They are advised by the office.
>
> Q. Who, at the office, would advise them?
>
> A. That would be a question for the office but, you know -- it actually is one of the people I know there, she works at the front desk.

78.     Ten out of the eleven Provider Defendants owned by Ahmed neither owned nor leased the offices from which they purportedly provided the Fraudulent Services.

19

79.     Ahmed did nothing that would be expected as an owner of legitimate medical professional corporations to develop their reputation and attract Patients to the Clinics. Ahmed simply testified that he found the clinics through "word of mouth."

Q. How did you learn of those locations?

A. Word of mouth.

Q. Can you tell me specifically who advised you of those locations?

A. No.

***

Q. When you negotiated the lease with Dr. Barakat, did you advise him that your practice performs shockwave?

A. Yes.

Q. Does he also provide shockwave services?

A. That's a question for him.

***

Q. Before you would go to a location, would you inquire if there was somebody there providing shockwave already?

A. I may or may not, but it's kind of a silly question.

***

Q. Did these facilities seek you out to provide shockwave, that's my question, did any facilities seek you out to provide services?

A. The way I come across facilities is word of mouth. I answered that question before.

80.     The healthcare services that he could provide to the Patients at the Clinics was dictated by the unlicensed laypersons, including the Doe Defendants, who directed every step of the Patients' treatment and what providers the Patients saw at the Clinics.

81.     Ahmed testified on behalf of several of the Provider Defendants at multiple Examinations Under Oath ("EUO") that the only source of Patients for the respective Provider Defendants was through his mantra: "word of mouth."

82.     Contrary to Ahmed's mantra the only way the Patients learned about the Provider Defendants was through the unlicensed laypersons associated with the ABC Clinics who commanded the Patients to expose themselves to the Fraudulent Services, only because of the illegal kickbacks paid by Ahmed, his Doe Defendant handlers, and the Provider Defendants.

83.     Ahmed further testified at multiple EUOs that "word of mouth" was also how he learned about the opportunity to provide services to Patients at scores of clinics.

84.     Each time he was asked at the EUOs, Ahmed claimed that he was unable to recall any additional details whatsoever regarding how he learned about the opportunity to provide services at even a single Clinic, including who told him about the Clinic, when he learned about the Clinic, or where he was when he learned about the opportunity to see Patients at the Clinic.

85.     Ahmed came to the Clinics pursuant to illegal kickback arrangements with the Doe Defendants enabling the Provider Defendants to obtain Patients at the numerous ABC Clinics.

   **C.     The Clinics Sole Objective is the Enabling of No-Fault Insurance Fraud**

86.     Neither Ahmed nor any other medical professional that rendered services under the names of the Provider Defendants at the Clinics had a genuine doctor-Patient relationship with the Patients that came to the No-Fault Clinics, as the Patients had no specifically scheduled appointments with Ahmed or the Provider Defendants.

87.     The Patients were simply told by the Clinics' unlicensed laypersons to subject themselves to treatment by whatever individual was working for the Provider Defendants and whatever other medical providers were present on a given day in return for kickbacks.

88.     Though superficially created to provide a range of healthcare services to Patients at a single location, the ABC Clinics are a smoke screen behind which multiple laypersons and their licensed associates create and submit fraudulent bills to insurance companies.

89.     At the Clinics, unlicensed laypersons, rather than the healthcare professionals, created and regulated the Patient base while dictating fraudulent protocols used to generate profits without regard to medical necessity or actual Patient care or well-being.

90.     The Clinics provided the facial illusion of facilities for the Provider Defendants which in truth are revolving doors of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other supposed healthcare providers, all of whom abuse New York's no-fault insurance system to steal.

91.     At many of the Clinics, ALLSTATE received billing from a constantly changing group of fraudulent "healthcare providers," starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of Patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations.

92.     For example, Insurers, including ALLSTATE, have received billing for purported healthcare services rendered at the clinics located at 2488 Grand Concourse, Bronx; 615 Seneca Avenue, Queens; and 79-45 Metropolitan Avenue, Middle Village from a continually morphing pool of more than 100 purportedly different healthcare providers.

93.     Insurers, including ALLSTATE, have received billing for purported healthcare services rendered at the clinic located at 513 Church Avenue, Brooklyn by a revolving door of more than 75 purportedly different healthcare providers.

94.     Insurers, including ALLSTATE, have received billing for purported healthcare services rendered at the clinic located at 1655 Richmond Avenue, Staten Island from more than 70 different purported healthcare providers that come and go with rapidity.

95.     Insurers, including ALLSTATE, have received billing for purported healthcare services rendered at the clinics located at 82-25 Queens Boulevard, Woodside, NY and 332 East 149th Street, Bronx, NY, from more than 40 purportedly different healthcare providers and so on.

96.     Some of the providers who operated from the Clinics and associated with the Provider Defendants have a history of professional misconduct that limited their employment opportunities or limited the development of their own legitimate practices.

97.     For example, Joseph A. Raia MD, P.C. (the "Raia P.C.") is a professional corporation allegedly owned by Joseph Raia, M.D. ("Dr. Raia"), which was a source of referrals of Patients to one or more of the Provider Defendants for Fraudulent Services.

98.     In 2014, Dr. Raia was charged by the Office of Inspector General with submitting false and fraudulent claims to Medicare for services that he never provided. As a result of those charges Dr. Raia was excluded from participating in all federal healthcare programs for fifteen years and was required to pay $1.5 million in penalties.

99.     Another physician who served as a referral source of Patients for one or more of the Provider Defendants is S. Ramachandran Nair, M.D., who pled guilty in 2003 to, among other things, submitting a false Medicaid claim and was excluded from participating in all federally funded health care programs for five years. Thereafter in 2006, he was placed on probation by the New York State Board after being charged with two counts of professional misconduct.

100.     Several of the Clinics from which Ahmed and the Provider Defendants operated are identified in _United States of America v. Anthony Rose, et al_., 19-cr-00789 (PGG) (S.D.N.Y.)

23

("USA v. Rose") as being controlled by laypersons and as receiving Patients because of illegal kickback and referral arrangements.

101.    In *USA v. Rose*, multiple individuals were indicted in November 2019 for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential Patient information. To profit from the Patient information Anthony Rose ("Rose"), who pled guilty, admitted to being the leader of the scheme and setting up a fully staffed call center to contact the Patients and to steer them to a preferred network of medical clinics and lawyers in New York and New Jersey. The medical clinics, including some of the Clinics where the Provider Defendants operated, paid Rose kickbacks in exchange for the Patient referrals.

102.    Government affidavits filed in support of surveillance warrants, including wiretaps, were unsealed in *USA v. Rose*. These affidavits detail the mammoth scope of the Patient brokering scheme, reveal the identity of numerous layperson controllers and fraudulent clinic locations, and expressly implicated several of the Clinics where Ahmed and the Provider Defendants operated. *See USA v. Rose*, ECF No. 398.

103.    Contrary to Ahmed's EUO testimony that the Provider Defendants received Patients solely through "word of mouth," the Government affidavits unsealed in *USA v. Rose* include excerpts of wiretaps and other evidence indicating that, among dozens of other locations, Patients were steered to the following layperson-controlled Clinics: 105-10 Flatlands Avenue, Brooklyn; 2273 65th Street, Brooklyn; 204-12 Hillside Avenue, Hollis; 2426 Eastchester Road, Bronx; 332 East 149th Street, Bronx; 488 Lafayette Avenue, Brooklyn; 60-40 82nd Street, Middle Village; and 69-37 Myrtle Avenue, Glendale.

104.    Several of the Clinics where the Provider Defendants rendered the Fraudulent Services are associated with Metro Pain Specialists P.C. ("Metro Pain"), a professional corporation

24

that has been named as a defendant in multiple no-fault insurance fraud cases involving fraudulent services billed to No-fault insurers based on allegations that it was controlled by laypersons and engaged in illegal kickback and referral arrangements. *See* *State Farm Mut. Ins. Co., et al. v. Metro Pain Specialists, P.C., et al*, 21-cv-05523 (E.D.N.Y.); *ALLSTATE Ins. Co., et al. v. Metro Pain Specialists P.C., et al.*, 21-cv-05586 (E.D.N.Y.)  These Clinics include: 105-10 Flatlands Avenue, Brooklyn; 1122 Coney Island Avenue, Brooklyn; 135 Eastern Parkway, Brooklyn; 1767 Southern Boulevard, Bronx; 204-12 Hillside Avenue, Hollis; 488 Lafayette Avenue, Brooklyn; 560 Prospect Avenue, Bronx; and 90-16 Sutphin Boulevard, Jamaica.

105.    Further demonstrating that fraud infused the Clinics from which the Provider Defendants operated, a chiropractor who worked at the Clinic located at 615 Seneca Avenue, Queens, verified that prescriptions for durable medical equipment that contained the chiropractor's name were not actually signed, reviewed, or authorized by him, but instead contained photocopies of his signature that were fraudulently copied and issued without his knowledge and consent.

### D.    The Illegal Kickbacks Detailed

106.    The financial arrangements that Ahmed and the Provider Defendants entered included: (i) payments to the leaseholders at the ABC Clinics disguised as "rent" for office space and personnel; and (ii) payments to a series of shell companies disguised as legitimate transactions.

**Bogus Rental Payments**

107.    The amounts of the "rental" payments made by Ahmed to the ABC Clinics were far more than the fair market value for the non-exclusive use of the clinic locations.

108.    For example, ENS Medical, ECMC, and Queens Medical claimed to have lease agreements whereby they paid, at multiple Clinics, approximately $750.00 to $2,000.00 per month

25

in alleged "rent," even though they used non-exclusive space and usually rendered services only once or twice per month at each Clinic.

109.    In addition, at Clinic locations that were shared among Provider Defendants Ahmed would pay multiple rents.

**Other Disguised Kickbacks**

110.    Ahmed effectuated the payment of kickbacks by paying entities that purported to provide legitimate business services, such as "marketing," "advertising," "consulting," "transportation," "cleaning," "administrative," and "construction" services, but which had no legitimate operations or services. Instead, the Shell Companies were used as vehicles to conceal payments made to other entities as kickbacks in exchange for Patient referrals.

111.    In furtherance of the illegal financial arrangements Ahmed incorporated Queens Corona Medical Care PC ("Queens Corona") on March 3, 2015. Queens Corona never treated Patients or conducted legitimate business.  Queens Corona is a shell entity.

112.    For example, Queens Corona was implicated in a healthcare fraud money laundering scheme and subject to forfeiture. *United States of America v. Pisman, et al.,* Case No. 4:16-cr-000066-RLW;  *United States of America v. Approximately $91,246.57 from New Millienium Medical Imaging, P.C., Investors Bank Account., et al.,* Case No. 4:16-cv-00877-CEJ. Specifically, Queens Corona made payments to shell corporations associated with Tea Kaganovich and Ramazi Mitaishvili.  Kaganovich and Mitaishvili, admitted paying approximately $18.5 million in kickbacks for the referral of Patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx in connection with their guilty plea to health care fraud in the Eastern District of New York. *United States of America v. Tea Kaganovich, Ramazi Mitaishvili,* 17-CR-00649 (E.D.N.Y. 2019).

26

113.    In addition, Ahmed's kickback scheme involved payments from the Queens Corona bank account to entities associated with Nathan Yusufov ("Yusufov"). As an example, Yusufov is the authorized signatory on the bank account of Any Choice Supply Corp. d/b/a A-Z Services although the corporation is registered to Victor Abayev as the Chief Executive Officer. Queens Corona wrote multiple checks to Any Choice Supply in amounts ranging from $1,400 to $2,700 dollars for no apparent reason.

114.    Yusufov was indicted for his participation in a $146 million-dollar health care fraud scheme based on allegations that he utilized (i) "recruiters" who identified potential Patients, offered cash to induce a person to become a Patient, and coordinated their transportation to the affiliated medical clinics; (ii) he sold the Patients to owners, managers, and staff of medical clinics; and (iii) "shell" businesses and corporations laundered the proceeds of the health care fraud. *See People v. Kristina Mirbabayeva,* Indictment No. 9476/2017 (Kings County Supreme 2017).

115.    On April 4, 2019, Yusufov pleaded guilty to, among other things, Money Laundering in the Third Degree. At his plea allocution, Yusufov confirmed that he served as the "de facto manager" of several entities and that he knew that the property involved in one or more financial transactions of those entities represented the proceeds of health care fraud.

116.    Meanwhile Abayev has fled the United States to avoid prosecution for a colossal money laundering scheme disguised as a religious charity and associated publication.

117.    As further example in exchange for Patient referrals Ahmed made at least $110,000.00 worth of payments from a corporate bank account associated with Queens Corona to Shell Companies, including payments to (i) a purported network services company totaling at least $32,000.00; (ii) a purported professional administrative services company totaling at least $22,000.00; (iii) a purported computer and network services company totaling at least $13,000.00;

27

and (iv) a purported litigation support company totaling at least $14,000.00. These include – just a brief sample of payees and certain checks – payments to:

Alco Medical Typing Inc. ($2,950.00)

Alan Trading & Consulting ($2753.19)

Professional Administrative Srvc ($2,800.00)

Medcomp Network Services ($3,260.00)

Best Eastcoast Cleaning ($2,760.00)

Touvishi-Light ($1,622.00) (The owner of this purported publication that served as a money laundering conduit by ostensibly selling false advertisement fled the United States and returned to the former Soviet Bloc)

United Filing ($1,900.00) ($1,420.00)

Best Human Resources Inc ($2,100.00)

R&Z Litigation Src ($2,800.00) ($4640.00) (3,800.00) ($4,100.00)

118.    Northern Medical made payments to the same above entities.

119.    The above payments have dual purposes: (i) Corona Medical would receive 90 to 95% of the face value of the check back in the form of cash which cash is needed to pay for Patients since Patient brokers will usually only take cash; (ii) the payments masquerade as legitimate business expenses to reduce taxable income.

**Northern Medical**

120.    Ahmed's Northern Medical operated in concert with Igor Meyzenberg, L.Ac, David Kranser, DC, and Madhu Bopanna at a Clinic located 105-20 North Blvd Corona New York 11368. Meyzenberg made payments to facilities associated with Igor Dovman and Tamilla Dovman for referrals to entities including Northern Medical. When questioned in a civil action as to whether

these payments were kickbacks for Patients, Igor Dovman invoked his 5th Amendment right against self-incrimination.

121.    In exchange for the referral of auto accident victims to Northern Medical, Ahmed made at least $70,000.00 worth of payments from a bank account associated with his shell corporation, Queens Corona Medical, P.C. to entities with no legitimate business operations, including payments to (i) a purported network services company totaling at least $24,000.00; (ii) a purported professional administrative services company totaling at least $17,000.00; and (iii) a purported computer and network services company totaling at least $13,000.00.

122.    Northern Medical also paid kickbacks in exchange for Patient referrals to the same companies paid by the Kaganovich and Mitaishvili both of whom admitted to paying approximately $18.5 million for the referral of Patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx. During their July 25, 2019, deposition in *Government Employees Ins. Company, et al. v. Weinberger, D.C. et al.*, 1:18-cv-06641 (E.D.N.Y. 2018), both Kaganovich and Mitaishvili invoked the Fifth Amendment against self-incrimination when asked whether they had issued checks to referral sources as payments in exchange for Patient referrals. Many of these referral sources were the same sources paid by Northern Medical.

123.    It was also found that payments for claims issued to Ahmed's Northern Medical were cashed by one Alla Kurtova at a check cashing service in New Jersey.  For example, Ahmed issued approximately $6,000.00 in checks to "Progress For Your Business, Inc." from Queens Corona's corporate bank account. While these payments were made to appear as if they were fees for services, these checks were exchanged for cash at a check-cashing facility by Kurtova.

124.     In 2013, Kuratova was indicted for participation in a prescription drug trafficking ring which recruited individuals to act as phony Patients in visits with corrupt medical practitioners where they received prescriptions for medically unnecessary prescription pain medication.

**An Amalgam of Suspect Activity**

125.     Ahmed's home address and cell phone number are used by out of state practices, including a DME company, even though he is not listed as an owner.  This includes AH Medical PC (NJ); Promenade Medical Care PC (NY) (Listed to a Dan Noor who is suspected to have an illegal ownership interest in some of the Provider Defendants); Solelil Medical PLLC (FL); Sandeve Medical Supplies LLC (NY) (Listed to a Dan Noor – see above)

126.     About Sandeve Medical Supplies,  Ahmed testified:

A. I submit billing under that entity.

Q. Are you familiar at all with that entity?

A. I'm not here to answer those questions so –

127.     Ahmed gave sworn testimony that Melana Kay (who is not a licensed healthcare professional) was an employee of Defendant Queens Medical and was paid an annual salary of $80,000 for billing services. Ahmed's testimony further indicated that Kay had access to Queens Medical's Patient files and was authorized to deposit checks into Queens Medical's bank account.

128.     Moreover, Melana Kay is the president of MESB and MCSB, two entities that received large amounts of unexplained payments from Queens Medical. Copies of the corporate resolutions filed with TD Bank for MCSB and MESB identify Kay as the president of those entities. Ahmed's prior testimony regarding Queens Medical indicated that Queens Medical paid $3,000.00 per month to MESB for "rent."  However, a review of Queens Medical's corporate bank

records revealed that Queens Medical paid far more than the $3,000.00 per month to Kay, MESB, and MCSB.  Queens Medical issued the following amounts to Kay, MESB, and MCSB:

| Year | Payments to MESB | Payments to MCSB | Payments to Kay | Total |
|---|---|---|---|---|
| 2017 | $52,300.00 | None | $52,652.08 | $104,952.08 |
| 2018 | $106,900.00 | $9,000.00 | $57,340.04 | $173,240.04 |
| 2019 | $9,000.00 | $182,000.00 | $83,296.26 | $274,296.26 |
| 2020 | $283,000.00 | $80,000.00 | $88,405.44 | $451,405.44 |
| 2021 | $124,000.00 | $7,000.00 | $29,003.36 | $160,003.36 |
| TOTAL | $575,200.00 | $278,000.00 | $310,703.18 | $1,163,903.181 |

129.    Recent litigation also revealed the presence of a Danoo Noor who is not a physician in Ahmed practices.  Noor has held himself out as the "Managing Director" of Defendant ENS Medical. (Emails from Noor contain an email signature identifying him as ENS Medical's "Managing Director.")  Noor is listed as the managing member of a corporate entity called Town Medical, L.L.C. ("Town LLC"). (Organization documents for Town LLC and the signature card for its corporate bank account identify Noor as its managing member) Financial discovery in a prior action revealed that funds were funneled out of Town Medical's bank account, through Gelb's personal account, and into the Town LLC account. From there, Noor caused Town LLC to make large amounts of payments to himself (via payments to an entity called MDX Solutions Group, Inc.) as well as to Ahmed and a series of other nonphysicians.

130.    Noor received more than $70,000 from Town LLC over the course of just three months – between March and June 2021. Noor was also identified by Gelb as having provided marketing and advertising services for or on behalf of Town Medical.

131.    At the EUO of Garden Medical Care, Ahmed sought to distance himself from Noor:

Q. Do you know, are you familiar with Dan Knorr? [Phonetic spelling by court reporter]

A. Yes.

31

Q. How are you familiar with Dan Knorr?

A. I worked with him before.

Q. In what context?

THE WITNESS: Is this a fair question?

MR. TSIRELMAN: Yes, if it's related to Garden Medical.

A. He's not a current employee of Garden Medical. He may have been in the past.

Q. What are his credentials?

A. His credentials –

Q. Is he a medical professional?

A. No, he's not a medical professional.

Q. What does he do?

A. He was -- he's not working currently any longer but, you know, I believe he had administrative work in the past but I need to confirm.

Q. When you say "the past," what time period are you talking about?

A. Not within the timeframe of the claims that are being presented today.

MR. TSIRELMAN: Approximately, when was the last month?

A.  The last time I worked with him was probably over a year ago.

132.    Ahmed is the owner of two financial services entities organized in 2020 and 2021.

133.    Ahmed funded the Queens Corona corporate bank account, almost exclusively, by writing checks from his personal bank accounts to Queens Corona.

134.    ENS Medical's 2018 Federal Tax Return (Form 1120) listed $677,917 in "Other Deductions" which included the kickback payments that Ahmed and ENS Medical paid to access Patients at the Clinics.

135.    The unlawful kickback arrangements were essential to the success of the Defendants' scheme because without access to Patients, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill ALLSTATE and other insurers.

136.    Ahmed always knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

137.    Ahmed and the Defendants conducted their scheme through multiple medical professional corporations using different tax identification numbers, to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number thereby avoiding detection to prolong their fraudulent scheme.

**A DEMONSTRATIVE EXAMPLE OF HOW AHMED PRACTICES OPERATE**

138.    An Examination Under Oath ("EUO") of Patient M.B. in connection with his claims for no-fault benefits for date of loss March 8, 2023, was conducted on June 15, 2023. M.B. treated at Defendant Modern Brooklyn Medical.

139.    M.B. testified that the tow truck that came to the scene of his accident had a passenger sitting in the front seat. M.B. did not know whether the individual was employed by the tow truck, or the body shop.  The passenger handed M.B. a card advertising Modern Brooklyn Medical. The passenger told M.B. that M.B. should obtain treatment because of the accident.

140.    M.B. went to Modern Brooklyn Medical for a few visits.  M.B. then stopped treatment because he was not really hurt.

141.    After M.B. stopped going to Modern Brooklyn Medical, he constantly received calls from Modern Brooklyn Medical asking him to return to the facility.  M.B testified that the Clinic just wanted to use his insurance money.

33

142.    Before he discontinued treatment, Modern Brooklyn Medical also directed him to an attorney.  He met with the attorney outside of the Modern Brooklyn Medical facility.

143.    Modern Brooklyn Medical recommended that M.B. receive surgery. M.B. testified that because he was not in any way hurt M.B. declined the surgery.

144.    Modern Brooklyn Medical further suggested that M.B. receive an epidural injection but M.B. testified that he did not want anything "in his spine" because of "the risks."

145.    The recommended surgery and injection were discussed with a female, not Ahmed.

146.    M.B. denied receiving treatment and devices that ALLSTATE was billed for. Further M.B. denied any knowledge of Affinity Acupuncture Health Care and PCC Chiropractic, both of whom are co-lessors with Modern Brooklyn, both entities also billed ALLSTATE.  M.B. further denied performing any kinds of exercises for which ALLSTATE was billed by Modern Brooklyn as "Therapeutic Exercise." Finally, M.B. denied any knowledge of Omar Ahmed. When M.B. was shown Ahmed's photo M.B. denied ever seeing the individual before despite billing from Modern Brooklyn that that indicates that Ahmed had treated M.B.

**THE CLOISTERED EXAMINATIONS UNDER OATH OF AHMED DEMONSTRATE THAT HE DOES NOT CONTROL THE PROVIDER DEFENDANTS**

147.    The hallmark attributes of an Ahmed EUO, aside from haughty, supercilious, pugnaciousness, is his refusal to cooperate and how Ahmed's counsel cloisters him in a shield of interruptions and obtuse objections.

**A.    The Prototypical EUO of Modern Brooklyn**

148.    Ahmed started the EUO by giving his educational background.  The following ensued three pages into questioning:

Q. When were you licensed to practice medicine?

A. 2006.

Q. Have you been licensed in any other states?

A. Yes.

Q. What other states have you been licensed in?

MR. ZIMMERMAN: I'm going to object. We are here for New York no fault. We are not here for anything else. If he's not currently practicing in another state, then it doesn't take away from his time to practice with this company. So therefore I'm going to advise my client not to answer.

[The objection is unjustifiable]

Q. Since you were admitted to and licensed to practice medicine in New York in 2006 can you give me a brief description of your professional background?

A. I already provided that.

[Ahmed did not]

Q. I'm sorry?

A. I am not going to provide anything else.

MR. ZIMMERMAN: I would say the question is kind of open ended. Since you have been admitted to practice medicine in New York, have you practiced medicine?

[Ahmed's counsel begins his pervasive hijacking of the EUO that morphs to counsel testimony]

THE WITNESS: I have been licensed to practice medicine since 2006. I provided my educational --

MR. ZIMMERMAN: What I was asking, Doctor, what I was asking is this. Have you sold cars since 2006 or have you continued to practice medicine since 2006?

THE WITNESS: I previously worked outside of practicing medicine if that's the question.

Q. So my question now is since 2006 where have you practiced medicine?

MR. ZIMMERMAN: Okay, it is irrelevant. So the party that is here is Modern Brooklyn. He's a representative of Modern Brooklyn. He's the owner of Modern Brooklyn. Prior places that he's worked is not relevant to Modern Brooklyn.

149.     Ahmed and his counsel sought to cover up the overlapping ownership of multiple medical P.C.s, which is key to their scheme to evade the detection of Ahmed's insurance fraud and the fact that Ahmed is a poorly qualified physician.

Q. Do you own any other professional medical corporations other than Modern Brooklyn?

MR. ZIMMERMAN: I'm going to object to the question as it is posed. It means it doesn't necessarily have relevance. If you ask some other questions, you may get back to it. But I'm going to object to the question as it is posed.

Q. In the past six months where else have you been treating Patients?

A. Are there any bills today that are submitted by another company besides Modern Brooklyn Medical?

Q. Yes. There are many bills that you are listed as treating provider other than Modern Brooklyn Medical which is why I'm trying to establish the schedule.

A. This EUO is for which PC?

Q. This EUO is for Modern Brooklyn Medical.

THE WITNESS: I will answer questions about Modern --

MR. QUINN: These questions --

THE WITNESS: I'm not going --

MR. ZIMMERMAN: Can we pause this for one second and I'm going to call my client.

[Ahmed's counsel muted the proceeding so that he could call Ahmed]

MR. QUINN: Back on the record. Read back the last question, please.

(Requested portion was read by reporter.)

MR. ZIMMERMAN: I'm going to object to the question to the extent that it is not relevant where he may have treated Patients in the last six 6 months. My client has testified the days that he is generally in his office. If he wants to elaborate, he can elaborate, but beyond that it is not relevant to Modern Brooklyn.

150.   Billing from the multiplicity of Ahmed's Provider Defendants places Ahmed at multiple disparate locations all at once. EUOs of Patients have failed to identify anyone resembling Ahmed with these Patients at the date and place that Ahmed's bills state that he treated them. The Patients that are the subjects of EUOs do not know Ahmed, they never heard his name:

Q. What are your other professional medical duties?

MR. ZIMMERMAN: Are you talking about with this business?

MR. QUINN: Where else is he actively treating Patients, where --

MR. ZIMMERMAN: Not relevant.

MR. QUINN: If ALLSTATE is receiving bills from other entities on Tuesdays and Thursdays where Dr. Ahmed is a treatment provider -- I'm asking where else does he work if he can't give me a clear schedule, what other places is he treating Patients.

MR. ZIMMERMAN: I don't see how that is relevant if he tells you generally the days that he's at Modern Brooklyn. If you provided him with a verification let's say after this and say where were you on such and such a day, then you know either specific to open claims, he will respond and he will tell you what offices he was at when he was at them. But you are asking him to nail down a schedule that isn't specific right now. It varies.

MR. QUINN: I'm not asking him to nail down anything, just what professional medical entities is he currently working at.

MR. ZIMMERMAN: You guys are well aware what entities bill ALLSTATE.

MR. QUINN: We are trying to verify whether he's actively at Modern Brooklyn.

MR. ZIMMERMAN: Then ask him do you treat Patients, do you see Patients, do you own this company, do you manage that. For those companies, not for Modern Brooklyn. He has testified he goes to Modern Brooklyn. That's what's relevant for Modern Brooklyn. It is not relevant for anything else.

150.   Ahmed's attorney made an alleged offer to expedite matters:

MR. ZIMMERMAN: You know what then you guys should be requesting an EUO from the other facilities and asking him questions about those facilities. If you want them all, it is very simple and I have done this before with other providers where somebody has multiple companies and they are getting examinations under oath from each of the

37

companies that they own. I have agreed to sit down in one sitting and address questions for all the companies.

MR. QUINN: Would you like to do that now?

MR. ZIMMERMAN: Well as far as I know he doesn't have examinations under oath from other companies …

MR. QUINN: There is other examinations under oath that were pending and they have been noticed. I will gladly take you up on that and ask you about those right here, the other facilities that are owned by Dr. Ahmed. So if you would like to do that, I will consent to doing that.

MR. ZIMMERMAN: The only examination under oath that I'm aware of is for Modern Brooklyn and it was the only one I was retained for …

Q. I just want to say when you say you are typically there Tuesdays and Thursdays, what do you mean by typically there? Are you there every Tuesday and Thursday? Are you there every other Tuesday and Thursday?

A. So I don't want to give you the definition of typically and that's my answer. So if you don't understand what typically means, look it up and that's it.

153.    The word "typically" is quite broad. And it continued –

Q. Can you tell me about shock wave therapy?

MR. ZIMMERMAN: I'm going to object … My next question was going to be are any of the Patients that have claims pending have billing for shock wave therapy?

[It is not Ahmed's lawyer's place to ask questions at the Examination of Ahmed by ALLSTATE]

Q. Doctor --

MR. ZIMMERMAN: By the way you can put this off or whatever. I always think this shock wave therapy thing is amusing because shock wave therapy actually works. Go on.

Q. Please explain, Doctor. How does shock wave therapy work?

MR. ZIMMERMAN: I'm not the doctor. [The question was asked of Ahmed the doctor] I'm a lawyer. I'm telling you from my own experience. But since Modern Brooklyn doesn't do shock wave therapy, it is not an appropriate question for examination under oath.

***

38

MR. QUINN: No. We are trying to establish when Dr. Ahmed is treating Patients at Modern Brooklyn and we have spoken to Patients and they don't recognize his name and we have billing from many different locations on the same days that he was describing for me that we are being told that he's present in Modern Brooklyn when he's in completely different locations.

MR. ZIMMERMAN: What you consider basic background questions, I don't consider background questions. The bottom line is I completely understand you have bills from multiple facilities and you are trying to figure out where he is or when he is and that's fine.

However, if a bill from Modern Brooklyn is Dr. Ahmed signed at the bottom, but the provider that actually touched the Patient is you know June Lee -- I'm making up name -- the PT, that doesn't mean that Dr. Ahmed is sitting in that facility at that time. He may be performing an EMG and NCV at another location elsewhere and that's not a conflict. You can also at the same time have another employee of his at a different company treating another Patient and there is no conflict. Your questions are not designed to elicit a response to figure that out. The way to figure that out is to say, Doctor, on such and such a date we have you performing an EMG/NCV at this office at this time. We have you performing an EMG/NCV at this time for a different provider in a different county. Can you explain where you were and when you were. That's a question that would elicit a response.

***

Q. So when you go to Modern Brooklyn what other locations will you work at?

MR. ZIMMERMAN: I'm not going to have him answer. He goes to other locations. That's it. Today you are on Modern. If you want to ask him specific questions related to the treatment or records you have, you are welcome to do so.

151.    And the lawyer testimony continued page after page –

MR. ZIMMERMAN: In other words, it is not a sublet. You know the lease is in Modern Brooklyn's name, but the other two can -- all three pay directly to the landlord. If I can help because I already asked this and I know it is an odd situation. Basically the landlord – they all got the place together, but the landlord wouldn't put it in all three names. They wanted it in one name, so they put it in Modern Brooklyn's name. But all three of them are really the tenants. I'm just trying to help and speed things if that's okay.

***

You are asking did they do a new lease. The answer is no. He gave me an addendum. So it is the same lease.

***

39

MR. ZIMMERMAN: By the way just I'm sure you guys already know this, but I just looked up the address. 1201 Nostrand, LLC looks like they own the building. I'm looking for a deed. Oh, there is a deed. Yep. 1201 Nostrand, LLC owns it.

152.     Ahmed often could not answer questions so his counsel bailed him out:

MR. ZIMMERMAN: It is your phone number. Whether somebody else may call on it, it is your number though, is that right?

THE WITNESS: Yes.

***

Q. Who are your employees?

MR. ZIMMERMAN: I'm going to object. I think the only relevant employees would be the employees that treat the Patients. So why don't we go there.

Questions as to who prepares the billing are obviously relevant.

153.     But the unsolicited interference by Ahmed's lawyer backfires:

MR. ZIMMERMAN: That's if the person goes for the actual consult who decides to have you examine the Patient for a neuro, for an EMG consult or do you examine every Patient?

THE WITNESS: I instruct the front desk when there is an abnormal MRI of the neck or back that the Patient sees either myself or Dr. Poretskaya for a potential consultation and testing based on the consult.

Ahmed, prodded by his attorney's blathering meddling made a critical error in admitting that

laypersons at the front desk decide who gets an EMG.

154.     Ahmed's efforts to gloss over the above error became haughtily belligerent:

MR. ZIMMERMAN: So he directs the front desk staff to set up the consult if the findings show a certain thing. And then either he or Poretskaya do the consult.

Q. When you say the consult, what do you mean by that?

A. These are excruciatingly basic questions. You asked me what a consult is?

MR. ZIMMERMAN: What is a neuro consult for determining whether somebody needs an EMG/NCV. They are basic for you. Not basic for him.

THE WITNESS: I don't understand why he needs to know what a consult is.

40

MR. ZIMMERMAN: Doctor, he's not a doctor.

THE WITNESS: Apparently. There is no question about that. I'm going to say it so he understands.

A. A consult is performed by a physician to evaluate a Patient.

Q. What I don't understand and what I'm trying to understand --

A. Oh, my God. You don't understand that?

Q. I do understand that --

A. I don't know you are just like really like very basic. But go ahead. Explain to me what don't you understand.

Q. You say the Patient needs a neurological consult for an EMG test, is that correct?

A. I say a Patient needs a neurologic consult for EMG test. I already answered that question. So when you get the record, review it. Sit down with the dictionary, go through the definitions. Take your time.

Q. What I'm not understanding is what do you tell the front desk people; you tell them that you need to give them a consult or Dr. Poretskaya?

A. You are not paying attention and you are not listening to my answers. I will answer that question once again. Even the attorney, my attorney gave you the information. When an MRI is performed by for a Patient and there is abnormalities on the MRI, the Patient is instructed to see either myself or Dr. Poretskaya for potential consultation. And if the consultation has positive findings, to proceed with the EMG nerve conduction study. That is a 100 percent clear. If you don't understand it, move on. You are killing everybody's time.

155.    If one looks at the 199-page transcript one will readily see that over half is devoted

to the testimony of Ahmed's lawyer, lawyer colloquy, and Ahmed's obstructive insults:

Q. What is Dr. Huey, what's her schedule like?

A. First of all it wasn't Dr. Huey. I clearly said she was a PA. You were not paying attention. I don't know what you are doing over there on your computer, but --

MR. ZIMMERMAN: Doctor, Doctor, Doctor.

A. -- she is a PA. I said that before.

41

MR. ZIMMERMAN: Doctor, Doctor.

156.    The Examination degenerated into pandemonium:

AHMED. I would take a past medical history, past surgical history, record their allergies and medications which are ridiculous questions to ask, but I'm happy to answer them.

MR. ZIMMERMAN: No, those questions to a Patient are not ridiculous …

THE WITNESS: For a health care attorney it is ridiculous. I'm happy to answer them.

***

Q. What do you include in your Patient history?

A. What do you mean?

Q. Like the medical history if they are a diabetic, have had prior surgeries?

A. These questions are extremely broad and very general.

MR. ZIMMERMAN: No, when you are –

A. When you are asking about a medical history, yes. These are questions you would ask someone who's a medical student.

[Ahmed should have had no trouble answering these questions if they are at student level]

Q. You said he's a technician. So define for me what you mean by technician?

A. You can look up the word technician.

***

Q. Does he have any credentials, referred to as –

MR. ZIMMERMAN: Credentials that are being used by Modern Brooklyn at the moment?

MR. QUINN: In the health care field.

MR. ZIMMERMAN: I'm going to object.

MR. QUINN: He's treating Patients.

42

THE WITNESS: He's not treating Patients. He's a technician.

Q. What does he do as a technician?

MR. ZIMMERMAN: Okay.

A. You can look up the word technician. He's an EMG and NCS – he performed the NCS component of the EMG/NCS study.

The problem is that Ahmed has no idea what the technician does.

157.   Ahmed is being protected – to a reprehensible degree – because (i) Ahmed knows nothing about his overlapping medical practices (the Provider Defendants); (ii) his billing falsely portrays Ahmed as providing treatment to multiple Patients at disparate locations at the same time when he provides no treatment whatsoever.

**B.    The Filibustering Tour De Force that is the EUO of Garden Medical**

158.   Ahmed attended the EUO of Garden Medical with new counsel but the same prevaricating quarrelsome demeanor.   In fact, the EUO was supposed to – following the admonishment of Ahmed's prior counsel – be taken of two of Ahmed's professional corporations simultaneously: Defendants Terrace Medical and Garden Medical.  However, on February 9, 2023, Ahmed's counsel notified ALLSTATE that Ahmed would still be showing up on February 10, 2023, for the EUO of Garden – but that the EUO of Terrace Medical would be adjourned.

159.   The adjournment was tactical as will be demonstrated by the testimony:

Q. Are there any other medical practices or entities that operate out of that same address that you provided, 205 West 54th Street, Apartment 11 A? [Ahmed had testified that this address was his home office wherein Garden Medical was incorporated but it did not see Patients there]

A.  Yes.

Q. What other entities operate out of that facility?

A. I'm going to answer questions regarding Garden Medical Care, no other facilities.

43

Q. The other facilities that operate out of that same address, are those facilities that you own or are there other entities that -- did you rent that space to anybody any other medical practices?

A. I'm going to answer questions regarding Garden Medical Care. If you want to EUO of other PC's, I guess you could submit that request.

Q. Just with respect to that address, there are other entities –

A. You keep repeating the same question over and over again and I've answered the question. I'm not providing any other key information regarding what's related to Garden Medical Care today.

Q. Just –

A. Please don't repeat the question.

\*\*\*

Q. Why did you decide to open the practice, Garden Medical Care?

A. To provide medical services.

Q. Was there any specific medical services that you sought to provide or contemplated providing when you incorporated Garden Medical Care?

A.  Shockwave therapy.

Q. I do understand you opened up a professional corporation. But why did you want to incorporate a new practice? You had existing practices. Why did you decide to open up a new business?

A.  Because I felt like it.

Q. Did you open up any other medical practices around that same time?

A. I'm here to answer questions regarding medical care only.

MR. TSIRELMAN: Note my objection please to that question.

Q. So, for example, you received another EUO which was scheduled today which was adjourned, Terrace Medical Incorporated as far as the records received by ALLSTATE, four days later on April 16, 2021. My question with respect to what was the business reason to open up two practices over a four day period?

MR. TSIRELMAN: This is exactly why we've asked to have an EUO of one at a time, because it's going to get very confusing [the proper word is "incriminating"] if we start jumping back and forth. We are here only to answer as to this PC and the doctor's answer was he felt like it, I believe, if I'm quoting him correctly. The next time we have the EUO of the other company, you can ask him the same question and he'll answer it then.

MR. QUINN: ALLSTATE is just seeking to review documents received in the doctor's name. In those records ALLSTATE received over eight practices were opened by you in 2021. Does that sound accurate to you?

MR. TSIRELMAN: We are here only to answer as to one PC only and his answer is only as to this PC.

Q. Why did you decide to open up a practice to perform shockwave therapy?

MR. TSIRELMAN: I believe he answered that. I think he said he felt like it.

Q. So does Garden Medical provide any services other than shockwave therapy and examinations associated with shockwave therapy?

A. Were there any bills submitted to ALLSTATE, the subject of this EUO under Garden Medical Care for services besides shockwave therapy.

Q. I'll ask you that question. Were there any services other than shockwave therapy?

A. You are the one who requested his EUO.

Q. Yes, I'm asking you if there was any --

MR. TSIRELMAN: One second. We are here only to verify those claims that are part of this EUO. So if there is any claim that's not part of this EUO, we don't need to answer those questions.

***

Q. Has Garden Medical ever sold or factored any of its accounts receivable or medical claims?

MR. TSIRELMAN: Objection. The claims are not denied.

Q. On the front end before a claim was paid or denied, did Garden Medical ever sell any of its claims to a third party, to submit the claims, to –

MR. TSIRELMAN: Objection. We are here only for these claims, not for any other claims.

Q. Were any of these claims, have they been sold?

45

MR. TSIRELMAN: Objection. The claims were not denied yet. It's not relevant.

160.    The objections are obtuse:

We hold that on the strength of this regulation, carriers may look beyond the face of licensing documents to identify willful and material failure to abide by state and local law.

*State Farm Ins. v. Mallela*, 4 N.Y.3d 313, 322 (N.Y. 2005). Investigations/verification of claims must be performed prior to any denial of the claim.

161.    Ahmed was repeatedly questioned as to whether any of the billing was performed out of state.  He was adamant that all billing was performed by two New York State law firms. The following then occurred:

MR. QUINN: I'm going to share a bill and ask that it be marked as ALLSTATE Exhibit 1. … Are you able to see the document, doctor? … It's P.O. Box 246 Middletown, Delaware 19709.

MR. TSIRELMAN: Middletown, Delaware.

Q. Doctor, do you recognize this document?

A. Yes.

Q. What do you recognize it to be?

A. My name is on the document, Garden Medical Care, PC is on the document but I don't have the complete file. You are showing one page out of I don't know how big this file is, so I would like to see the entire document from start to finish.

Q. When you say "the entire document," what are you referring to?

A. … I need to confirm that this is part of a file as opposed to a single page out of it. I want to see the entire document that this page is associated with.

MR. TSIRELMAN: I think he's saying he wants to see all the papers that were submitted with this bill, like the entire submission.

THE WITNESS: The entire file, correct.

Q. Without that you can't verify what this document is?

46

A. It says my name on it and it has Garden Medical Care on it but this is some kind of quiz and I don't think that's appropriate. I want to see the entire file … I am asking for the entire file associated with this bill … Other than that, I don't think that's appropriate.

Q. With the Patients that were notified about this Examination Under Oath today ALLSTATE requested that you produce the entire file. Did you bring that with you today?

A. You are conducting the EUO and you are conducting the questions. I am asking if you have a question regarding this one page, I want to see the entire file associated with this page.

Q. The context of what the entire file, I don't know what you mean –

A. You don't know what that means? You are an attorney. You don't know what a file means?

Q. I know what a bill is.

A. I'm not going to answer, I'm not answering questions … I'm not going this route. Show me the entire file, I might answer your question …

162.    Obstructive objections became pervasive. Ahmed would be shown a bill or other document clearly emanating from his alleged practice, but he would refuse to answer questions about the document unless the entire no-fault file was produced for his inspection.

163.    Meanwhile the testimony demonstrated that contrary to Ahmed's knowledge an entity in Delaware was submitting billing for his alleged practice which demonstrated that Ahmed did not control said practice. The duplicitous objections were born out of Ahmed and his counsel's fear that his lack of knowledge about his own alleged practice would have been further exposed.

164.    Ahmed confirmed that Patients were obtained from laypersons at the front desk of the ABC Clinics:

Q. How do you get Patients at that location …

A. I provide services to those Patients. The Patients come to the facility.

Q. How do the Patients know that you are there?

47

A. They are advised by the office.

Q. Who, at the office, would advise them?

A. That would be a question for the office but, you know -- it actually is one of the people I know there, she works at the front desk.

165.    The evasion continued:

Q. Do you recognize this document?

A. In general, yes.

Q. What do you recognize it to be?

A. A bill.

Q. There is a PO Box referenced where all payments must be sent to. It says the Law Office of Akiva Ofshstein, PO Box 090382. Do you have access to that box?

A. This is the PO Box for the law office. I don't work for the law office.

Q. Do you have access to that PO Box?

A. Again, it's the PO Box of the law Office. I don't work for the law office.

Q. Is it fair to say you don't have access to it?

MR. TSIRELMAN: That's fair to say.

Q. The bill that we went through, can you walk me through how this is generated on behalf of Garden Medical?

A. It's a question for the billing company.

Q. What do you give to the billing company to generate this document?

A. I'm sorry?

Q. What do you give to the billing company to generate this document?

A. Again, you are not showing the entire file. You show parts of files and then want me to guess. I am not here for guessing games. Either show me the entire file or move on to your next question.

48

166.    After Ahmed defined what an entire file consisted of a lunch break was taken:

Q. I could have ALLSTATE pull it.

A. You should have pulled it before this EUO. That's called preparation for an EUO … I don't know if that's confusing to you. If you didn't pull it then that's a problem …

MR. TSIRELMAN: Everything that ALLSTATE has received in reference to this bill with this date of service.

THE WITNESS: Correct. Then we'll talk.

167.    When the parties returned from their break Ahmed was asked if he was familiar with a procedure known as Percutaneous Electrical Nerve Stimulation because he billed for it.

MR. QUINN: This is ALLSTATE Exhibit 2. I'm happy to e-mail this if it helps you to review it or I can change the screen so you are able to see it.

A. It looks like it's [so called PENS treatment] being used interchangeably with the shockwave.

Q. Is it the same treatment as shockwave?

A. It looks like in this case it's being used that way. Can you scroll up a little bit, a little bit more? Go up a little bit more. Here it says, first off says therapeutic radial pressure wave. This is PENS. It looks like it's used interchangeably with shockwave.

Q. Are PENS and shockwave the same treatment?

A. In this situation it looks like the words are being used to refer to the same thing.

Q. Are they the same thing, though?

A. We are talking about a bill. We are not talking about everything. In this bill, the one you are showing me, if you look at under Indications it says, "Therapeutic radial pressure wave (PENS) therapy." In this situation, this bill looks like it's being used interchangeably.

168.    "PENS" treatment and Shockwave treatment are not the same treatments.  PENS is a minimally invasive electrical stimulation treatment for chronic pain. Extremely thin needles are used to deliver stimulation. Shockwave therapy consists of a clinician holding a shockwave device

49

against a portion of a person's body. The device sends high energy sonic shockwaves into the injured tissues. (See *infra*)

169.    In this instance the reports indicated that PENS treatment was administered but Allstate was billed for Shockwave. Ahmed tries to cover this up with belligerence:

Q. What device is used by Garden Medical to perform PENS therapy?

A. It's radial pressure wave therapy as I mentioned before and I already mentioned the machine.

Q. The same shockwave machine?

A. Well, I'm not sure if it's indicated on this form, but I use a Chattanooga machine which is a radial pressure machine.

Q. Are there any other devices that would be used for PENS treatment other than –

A. I highly recommend you stop using "PENS treatment." Let's not try to confuse everybody on the call, including yourself.

Q. Just to clarify, Dr. Ahmed, the report is a PENS consult?

A. I clarified. If you want to have a conversation with me we can talk. If you want to read a report without hearing what I'm saying, it's up to you. We are here to talk about radial pressure wave and I indicate on the form the terms are being used interchangeably in this instance. Let's talk about -- that's my suggestion. If you want to go on a tangent, feel free. But you have to wrap this up soon.

Q. Why are you using PENS and shockwave interchangeably?

A. You are not a doctor. I'm a doctor. I'm telling you radial pressure wave and PENS are being used interchangeably on this form. I recommend we focus on radial pressure wave because that is a service that is generally accepted to be performed with shockwave therapy. Don't debate the medicine. You are not a doctor.

Q. On this date of service with this Patient was --

A. Are you going to be wasting my time? Stop it.

MR. TSIRELMAN: Let him ask the question. Ask your question.

Q. Was PENS performed on this Patient on this day or was radial pressure shockwave performed on this day?

A. For the tenth time, radial shockwave and PENS in this instance, it's interchangeably used. But in order not to confuse yourself and everybody else on the call, let's refer to it as radial pressure wave. But you still seem confused but, hey –

170.   PENS and radial pressure (shockwave) are not interchangeable. In fact, no two treatments could be more dissimilar. Ahmed has no idea of what is going on at his alleged practice.

171.   Finally, after relentless pressure Ahmed made a confession of sorts:

A. So this background information here look like it's referring to PENS. It looks like the background information was probably not, you know, necessary because it doesn't directly relate to radial pressure wave. So I'll speak to my office and make sure that background information that's supplied, specifically refers to radial pressure wave and not to PENS. It doesn't impact the bill though.

172.   Ahmed now disingenuously maintains that only the bill matters when just before the break he refused to answer questions about bills unless "the file" was produced:

Q. Who? You said in this form they are being used interchangeably. Did you create this form? Who created this form?

A. This is background information that's submitted along with the medical record. Now, it appears in this situation the background information was talking about other and I will circle back with the company and insure going forward please include background information that is directly relevant to the procedure. So, it looks like some of this information, procedure description is not relevant here. But again, we should focus on the consult and the bill, not that kind of information. It looks like it may have been put in by accident. It's not totally relevant in this situation.

This so-called "background information" is supposed to form the basis for what is contained in the bill. If they do not match the bill is invalid.

173.   Ahmed addressed the following boilerplate language:

"Based on the objective findings today, active and passive range of motion is decreased moderately and palpation indicates mild to moderate pain for Patient at 7/10 level in vas [sic] and difficulty with ADLS of moderate severity."

51

A. Can you go to the first page? I advised my NP's and PA's that the Patient should have at least 7 out of 10 pain as a point of reference to, you know, help justify the procedure …

Ahmed thereby admitted that his scheme dummies up documentation to create medical necessity for the expensive shockwave therapy that he bills Allstate and other insurers for.

174.    Further testimony reveals that Ahmed does not control his practice:

Q. How was your signature applied to this document?

A. Electronically, it looks like.

Q. Who has authority to use your electronic signature?

A. I do.

Q. Does anybody else have authority to use it?

A. No.

Q. Scrolling down to Page 5 of this document, it appears to be a letter of medical necessity for bywave PENS treatment. Do you recognize this document?

A. Yes.

Q. What do you recognize it to be?

A. A letter of medical necessity for PENS.

Q. Who created this document?

A. It's based upon generally available information.

Q. Who wrote this document? Who created the document?

A. I said, based upon what's generally available.

Q. The actual wording the way it's written here, this is drafted by you. Is that correct?

A. Was it drafted by me? No.

Q. Who actually drafted this document?

A. As I said before, it's generally available. You can Google this information.

52

Q. I'm not talking about the information that's contained, the form itself, this form that's being used?

A. It's based upon publicly available information.

MR. TSIRELMAN: He's asking who created the document.

THE WITNESS: Who created the document?

MR. TSIRELMAN: Yes.

THE WITNESS: At one point I created it based upon generally available information.

Q. On this form here on Page 6, Consent to Perform Percutaneous Electrical Nerve Stimulation, who created this document?

A. It's the same answer for all these questions.

Q. When your electronic signature is on a document, does that mean that you reviewed the record?

A. These are several different documents that are put together. So, as I said before, it looks like these, a number of these documents probably should not have been included, but most of them relate to background information and the consent. So, I need to follow up with the billing company to make sure that the appropriate consent forms and background information are included in the file. So that is something I need to address, which I will. If other files have the same issue, I will address that, as well. But the consult and the billing associated with it, you know, would not change. Maybe the header would change. I would change it from PENS to just refer to shockwave therapy.

175.    Meanwhile Ahmed had testified that after his review only he could apply his electronic signature to the troublesome documents he attributes to the "billing company."

176.    Ahmed confirms inaccuracy:

Q. Are your employees authorized to perform PENS treatments on behalf of Garden Medical?

MR. TSIRELMAN: This is shockwave therapy.

A.  This is shockwave therapy performed on behalf of Garden Medical.

53

Q. I'm just going to reference back to ALLSTATE Exhibit 1, the bill for this Patient that's associated with that procedure. The code that is listed here is 64555. What does that code represent?

A. I have to see the entire file. I'm still not seeing the entire file.

[The code comes from the CPT manual not the file]

Q. Yes, that's the file associated with this bill, yes.

A. Okay. I would have to talk with the billing company regarding this concerning what's being billed for here.

Q. Do you know what that code represents, 64555?

[CPT code 64555 is described as: Percutaneous implantation of Neurostimulator electrode array which as described is not Shockwave]

A. Only in the description.

Q. Who chose to put that code on this bill, 64555?

A. The billing company is generating these codes under my supervision. I need to clarify the codes so that's where I stand. There is no description here along with these numbers.

[But Ahmed stated that he supervises the billing company]

Q. Which billing company created this bill?

A. It went to a P.O. Box in Delaware. It maybe the billing company based in Delaware but I don't know. I would think that's unusual so I need to look into this much closer.

Q. … This bill is paid, it goes down to the P.O. Box in Delaware. Does it get deposited in the Garden Medical account or does it get deposited into Alexis's account [person in Delaware]?

A. If a check is written to Garden Medical Care it can only be deposited into Garden Medical Care. I'm the owner of the Garden Medical Care account. I don't know why that's confusing.

Q. Is that the same for a bill that's paid to Ofshstein, is that also deposited into a Garden Medical account?

A. The check is written to Garden Medical Care. It can only be deposited into a Garden Medical Care account. It's not rocket science.

Q. So Page 1 on the bottom where it says, where it directs, it says "first submission," so this would be the initial mailing of the bill. As far as I understand it, if I'm wrong correct me, it notes, Akiva Ofshstein is directing that all payments be made to their firm under their tax ID number. Have you authorized them to do that?

A. It appears so, yes.

Q. Would they deposit it into their account?

MR. TSIRELMAN: Objection. Calls for speculation.

Q. Have you authorized the offices of Akiva Ofshstein to deposit checks made out to Garden Medical into their own account?

MR. TSIRELMAN: You can answer that.

A. It appears so, based upon this.

177.    Ahmed is not aware that Akiva Ofshstein is getting Ahmed's money. Ahmed is not aware of the fact that some entity in Delaware is billing on behalf of his practice.

**PREARRANGED/PREDETERMINED FRAUDULENT TREATMENT PLAN**

178.    The Defendants subjected every Patient to a pre-determined treatment plan with no regard to individual symptomology that resulted in more than $3.2 million in billing to ALLSTATE for medically unnecessary, experimental, excessive, and bogus services.

**1.    The Fraudulent Charges for Initial Examinations and Consultations**

179.    The Defendants purported to provide most of the Patients in the claims identified in Exhibits 1 through 11 with an initial examination or consultation or at least an examination of some sort allegedly tied to the treatment allegedly provided by the Provider Defendants.

180.    The Provider Defendants in most cases purported to perform the initial examinations and consultations at the Clinics where they obtained their paid for Patients.

55

181.    The initial examinations and consultations were performed as a "gateway" to provide a false basis to justify the Defendants' exploitation of the Patients through the Provider Defendants' respective medically unnecessary, excessive, experimental, and/or illusory services.

182.    The examinations resulted in virtually every Patient receiving at least one other Fraudulent Services on the same day immediately following the examination or consultation.

183.    Queens Medical usually billed their initial consultations under CPT code 99244, sometimes charging $974.07 or sometimes charging $649.38 or a charge of $324.69.  The code specifications are the same. Yet the charges are wildly fluctuating and inflated.

184.    Atlantic Medical billed its initial consultations under CPT code 99243, resulting in charges of $248.34 or $496.68.  Yet again in each instance the code specifications are the same. But the charges are wildly different.

185.    ENS Medical billed their initial consultations under code 99243, resulting in a charge of $248.34.  Sometimes ENS Medical would bill their initial consultation under code 99244 resulting in a charge of $324.69.  Nothing in the documentation explains the difference.

186.    Modern Brooklyn's existence appears to be almost solely based upon examinations and neurodiagnostic testing as opposed to treatment.  Amongst their multiple examinations, they bill their initial under CPT code 99205 consistently resulting in charges of $275.00.  This consistency as opposed to the wildly fluctuating charges and code variances that are the hallmark of Ahmed's other P.C.s is more than likely a product of the fact that the other P.C.s are located at widely different locations where rates and codes are set by different sets of laypersons.  With Modern Brooklyn there is one fixed location and only one controlling layperson(s).

187.    Northern Medical billed initial consultations under code 99204 resulting in an average charge of $157.63.

188.    Pegasus Medical, who provide TDT and VNG testing, billed initial consultations under code 99204 resulting in a charge of $203.76.

189.    Town Medical is primarily concerned with providing ESWT and billed initial consultations under code 99241 resulting in a charge of $152.86.

190.    Terrace medical billed virtually all its initial examinations under CPT code 99204 resulting in charges ranging from $127.41

191.    ECMC billed virtually all its initial examinations under CPT code 99212 which code is meant for "established" Patients, resulting in charges ranging from $619.38, $344.10, $137.64, or $68.62.  These examinations usually occurred on the day that ESWT was allegedly provided.  The fluctuating charges for the same code requirements are once again noteworthy.

192.    Garden Medical billed virtually all its initial evaluations under 99213, which code is also meant for established Patients resulting in a charge of $175.60, $263.40 or $87.80 – again the charges are wildly fluctuating. Garden also billed under 99204 resulting in a charge of $203.76.

193.    Go Medical is primarily concerned with providing ESWT.  When Go medical billed an initial virtually all its initial consultations were billed under 99213 which is a code designated for "established Patients" resulting in a charge of $87.80.

194.    The charges for the initial examinations and consultations were fraudulent in that they were medically unnecessary and were performed – if performed – pursuant to kickbacks that the Defendants paid at the Clinics in coordination with the Doe Defendants and the ABC Clinics.

a)        **The Misrepresentations as to the Length of the Examinations**

195.    For example, in every claim identified in Exhibits 2, 6 and 1 respectively, for initial examinations and consultations under CPT codes 99244 and 99243 Queens Medical, Atlantic

57

Medical and ENS Medical misrepresented the amount of face-to-face time that the examining healthcare professional spent with the Patients or the Patients' families.

196.    The use of CPT code 99244 requires that a healthcare professional spend 60 minutes of face-to-face time with the Patient or the Patient's family.

197.    The use of CPT code 99243 requires that a healthcare professional spend 40 minutes of face-to-face time with the Patient or the Patient's family.

198.    Though ENS Medical, Queens Medical, and Atlantic Medical billed almost all their respective initial examinations and consultations under CPT codes 99244 and 99243 no healthcare professional associated with the Defendants spent even 40 minutes on an initial examination.

199.    Rather, the initial examinations and consultations in the claims identified in Exhibits 2, 6 and 1 rarely lasted more than 10 to 15 minutes.

200.    ENS Medical, Queens Medical, and Atlantic Medical's respective purported initial examinations and consultations were documented using pre-printed checklist or templated forms.

201.    The pre-printed checklist or template forms that Ahmed, ENS Medical, Queens Medical, and Atlantic Medical used in conducting the initial examinations and consultations set forth a limited range of potential Patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

202.    All that was required to complete the pre-printed checklist or templated forms was a brief Patient interview and a perfunctory physical examination of the Patients.

203.    These interviews and examinations did not require the Defendants to spend more than 10 to 15 minutes of face-to-face time with the Patients.

204.    Modern Brooklyn, Pegasus Medical, Terrace Medical, Northern Medical, and sometimes Garden Medical, in claims identified in Exhibits 7, 9, 8, 11 and 4 respectively, for initial

examinations and consultations under CPT codes 99205 and 99204, also misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Patients or the Patients' families.

205.    The use of CPT code 99205 requires that a healthcare professional spend 60 – 74 minutes of face-to-face time with the Patient or the Patient's family.

206.    The use of CPT code 99204 requires that a healthcare professional spend 45 – 59 Minutes of face-to-face time with the Patient or the Patient's family.

207.    Though Modern Brooklyn, Terrace Medical, Pegasus Medical, Northern Medical and Garden Medical billed virtually all their respective initial examinations and consultations under CPT codes 99205, and 99204 no healthcare professional associated with the Defendants spent more than 10-15 minutes on an initial examination or consultation.

208.    Corroborating the fact that Modern Brooklyn, Terrace Medical, Pegasus Medical, Northern Medical and Garden Medical's initial examinations and consultations did not even last 10-15 minutes, Modern Brooklyn, Terrace Medical, Garden Medical's, Northern Medical and Pegasus Medical's initial examinations and consultations were virtually always documented via: one or two word fill in the blank soundbites such as "none," or "both shoulder;" check boxes presenting the Patient's complaints at very high levels of generality; check boxes presenting the medical history of the Patient at a high level of generality; check boxes portraying a limited physical examination with pre-printed choices such as "Mild/Moderate/Severe;" and a limited set of diagnoses and diagnostic plans to consider.

209.    There is no genuine physical examination given that Modern Brooklyn, Terrace Medical, Garden Medical, Northern Medical and Pegasus Medical supported their initial consultations with virtually identical, boilerplate examination forms for every Patient.

210.     All that was required to complete Modern Brooklyn, Terrace Medical, Garden Medical, Northern Medical and Pegasus Medical's boilerplate forms was to ask the Patient to list their subjective complaints and check off the generalized diagnoses that best matched those subjective complaints.

### b)     Misrepresentations Regarding the Performance of Consultations

211.     Pursuant to the Fee Schedule, the use of CPT codes 99244, 99243, 99205, 99204, 99241, 99212, 99213 and 99214 to bill for an initial and established Patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source. The above codes all state:

> Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the Patient's and/or family's needs.

212.     However, Queens Medical, Atlantic Medical, ENS Medical, Modern Brooklyn, Town Medical, Pegasus Medical, Garden Medical, ECMC, Terrace Medical, Northern Medical and Go Medical (the "Consultation Defendants") did not provide their purported "consultations" – if provided at all – pursuant to a legitimate referral from any other physician or other appropriate source. Rather, they were allegedly performed pursuant to the respective Consultation Defendants' fraudulent treatment protocol to generate illicit profits.

213.     The "results" of the supposed "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the "results" of the "consultations" incorporated into any of the Patients' treatment plans or acted upon in any way.

214.     Pursuant to the Fee Schedule, the use of CPT codes 99244, 99243, 99204, 99205, 99241, 99212, 99213 and 99214 to bill for a Patient consultation represents that the physician who

performed the consultation submitted a written consultation report to the physicians or other appropriate sources who requested the consultations in the first place.

215.     However, Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

216.     In the claims for purported "consultations" identified in Exhibits 1-11 the Consultation Defendants misrepresented the underlying services to be consultations billable under CPT codes 99244, 99243, 99204, 99205, 99241, 99212, 99213, 99214 because such consultations are reimbursable at a higher rate than commensurate Patient examinations.

### c)     Misrepresentations Regarding the Extent of Medical Decision-Making

217.     When Modern Brooklyn submitted charges for initial consultations under CPT code 99205, they represented that they engaged in medical decision-making of "high complexity."

218.     When Pegasus Medical, Terrace Medical, Northern Medical, and sometimes Garden Medical submitted charges for initial consultations under CPT code 99204 they represented that they engaged in medical decision-making of "moderate complexity."

219.     When Queens Medical submitted charges for initial consultations under CPT code 99244, they represented that they engaged in medical decision-making of "moderate complexity."

220.     When ENS Medical and Atlantic Medical submitted charges for initial consultations under CPT code 99243 they represented that they engaged in medical decision-making of "low complexity."

221.     When Town Medical submitted charges for initial consultations under CPT code 992431, they represented that they engaged in "straight forward" medical decision-making.

222. When Garden Medical and Go Medical submitted charges for consultations under CPT code 99213 they represented that they engaged in "straight forward" medical decision-making.

223. When ECMC submitted charges for consultations under CPT code 99212 they represented that they engaged in "straight forward" medical decision-making.

224. Pursuant to the American Medical Association's CPT Assistant which is incorporated by reference into the Fee Schedule (the "CPT Assistant"), the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the Patient's presenting problems, the diagnostic procedures, and/or the possible management options.

225. Though the Defendants falsely represented that their examinations and consultations involved medical decision-making of "high complexity" (when billed under CPT code 99205) "moderate complexity" (when billed under CPT code 99244, 99204 and 99214), "low complexity" (when billed under CPT code 99243 and 99213), "straight forward" decision making (when billed under CPT code 99241 and 99212) – in actuality the examinations and consultations did not involve any medical decision-making at all, and, in the improbable event that a Patient did present with injuries or symptoms with any degree of complexity, the deficient examinations and consultations were incapable of assessing and/or diagnosing them as such.

226. First, there was no risk of significant complications or morbidity – much less mortality – from the Patients' relatively minor complaints.

227.   Nor was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Provider Defendants.

228.   In almost every instance, any diagnostic procedures and "treatments" that the Provider Defendants provided were limited to either a series of medically unnecessary diagnostic tests, experimental ESWT and similarly experimental VNG and TDT testing – none of which were health or life-threatening if properly administered.

229.   Second, the Provider Defendants did not consider any significant number of diagnoses or treatment options for Patients during the initial examinations.

230.   In fact, no healthcare professional associated with the Provider Defendants engaged in any medical decision-making at all. Rather, the outcome of the initial examinations and consultations were pre-determined for virtually every Patient to result in boilerplate "diagnoses" that merely: (i) matched the Patients' subjective complaints; and (ii) added diagnoses that would justify performance of the Provider Defendants' fraudulent services.

231.   For example, corroborating the fact that ENS Medical, Terrace Medical, Northern Medical and Atlantic Medical performed EMG/NCV studies on virtually every Patient that received an initial examination or consultation, the result of virtually every initial examination included diagnoses of cervical and/or lumbar sprains and strains and cervical and/or lumbar radiculopathy in order to justify impending performance of EMG/NCV studies.

232.   Likewise, corroborating the fact that Queens Medical performed EMG/NCV on a significant number of its Patients, most Queens Medical's initial consultations included diagnoses of cervical and/or lumbar sprains and strains and cervical and/or lumbar radiculopathy to justify Queens Medical's impending performance of EMG/NCV studies.

63

233.   ECMC, Garden Medical, and Town Medical performed ESWT on virtually every Patient that received an initial examination or consultation. Predictably the result of virtually every initial examination or consultation included diagnoses of cervicalgia (neck pain), thoracic pain, and/or low back pain to justify performance of ESWT.

234.   In sum, the initial examinations/consultations did not reflect the Patients' actual circumstances and instead were designed to support the particular Fraudulent Service.

### d)   Misrepresentations Regarding "Comprehensive," "Detailed" and "complex" Patient Histories

235.   When Queens Medical submitted charges for initial consultations under CPT code 99244, they represented that they did a "comprehensive" Patient history.

236.   When Pegasus Medical, Terrace Medical, Northern Medical and in some cases Garden Medical submitted charges for initial consultations under CPT code 99204 they represented that they took a "complex" Patient history.

237.   In addition, when ENS Medical and Atlantic Medical submitted charges for initial consultations under CPT codes 99243 they represented that they took a "detailed" Patient history.

238.   Pursuant to the CPT Assistant a Patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the Patient's systems.

239.   Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a Patient's systems unless the physician has documented a review of the systems directly related to the history of the Patient's present illness, as well as at least 10 other organ systems.

240.   The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i) constitutional symptoms (e.g., fever, weight loss);
(ii) eyes;

64

(iii) ears, nose, mouth, throat;
(iv) cardiovascular;
(v) respiratory;
(vi) gastrointestinal;
(vii) genitourinary;
(viii) musculoskeletal;
(ix) integumentary (skin and/or breast);
(x) neurological;
(xi) psychiatric;
(xii) endocrine;
(xiii) hematologic/lymphatic; and
(xiv) allergic/immunologic.

241.    When Queens Medical billed for the initial consultations under CPT code 99244, they falsely represented that they took a "comprehensive" Patient history from the Patients they purported to treat during the initial consultations.

242.    In fact, Queens Medical did not take a "comprehensive" Patient history from the Patients they purported to treat during the initial consultations, because they did not document a review of the systems directly related to the history of the Patients' present illnesses or a review of 10 organ systems unrelated to the history of the Patients' present illnesses.

243.    Furthermore, pursuant to the CPT Assistant, a "detailed" or "complex" Patient history requires that the examining physician take a history of systems related to the Patient's presenting problems, as well as a review of a limited number of additional systems.

244.    However, ENS Medical, Atlantic Medical, Terrace Medical, Pegasus Medical, Northern Medical, and Garden Medical did not take a "detailed" Patient history or "complex" Patient history from Patients during its initial examinations and consultations, because they did not review systems related to the Patients' presenting problems and did not conduct any review of a limited number of additional systems.

245.    Rather ENS Medical, Terrace Medical, Atlantic Medical, Pegasus Medical, Northern Medical and Garden Medical simply prepared reports containing fake Patient histories to justify the performance of the Fraudulent Services.

**2.      The Fraudulent Charges for "Follow-Up" Examinations and Consultations Whether Given Initially or in a Follow-Up Setting**

246.    ECMC, Garden Medical, Town Medical, Terrace Medical, Modern Brooklyn, ENS, Northern Medical and Go Medical purported to subject the Patients, in the claims identified in Exhibits 3, 4, 5, 8, 7, 1, 11, 10 respectively, to fraudulent follow-up examinations.

247.    Garden Medical, Go Medical, and sometimes Northern Medical typically billed the follow-up examinations to ALLSTATE under CPT code 99213.

248.    ECMC and Town Medical virtually always billed the follow-up examinations to ALLSTATE under CPT code 99212.

249.    ENS, Modern Brooklyn, Terrace Medical and sometimes Northern Medical virtually always billed the follow-up examinations to ALLSTATE under CPT code 99214.

250.    Northern Medical billed the follow-up examinations virtually always to ALLSTATE under CPT code 99244.  This code requires counseling and coordination of care with other doctors; problems of moderate to high severity; and the examination should last approximately 60 minutes.

251.    Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the examinations were medically unnecessary and were performed – if performed – pursuant to the illegal kickback and fraudulent treatment protocol.

252.    The charges for the follow-up examinations were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

253.    For example, the charges for follow-up examinations submitted by ECMC, Garden Medical, and Town Medical were not supported by any report from a healthcare professional (or anyone) indicating that a follow-up examination of any kind had been performed.

### 3.    The Fraudulent Charges for Electrodiagnostic Testing

254.    Based upon the pre-determined "diagnoses" that they imputed to Patients during the alleged initial examinations ENS Medical, Queens Medical, Terrace Medical, Northern Medical and Atlantic Medical (the "Diagnostic Defendants") claimed to subject many of the Patients, in the claims identified in Exhibits 1, 2, 8, 11 and 6 respectively, to a series of medically unnecessary electrodiagnostic tests, including NCV and EMG tests ("electrodiagnostic tests").

255.    Like the charges for the other Fraudulent Services, the charges for electrodiagnostic tests were fraudulent in that the tests were medically unnecessary and were performed, if performed, pursuant to the kickbacks that Ahmed, Ahmed's Doe cohorts and the Diagnostic Defendants paid at – and to – the ABC Clinics in coordination with the Doe Defendants.

### a)    The Nervous System and Electrodiagnostic Testing

256.    The human nervous system contains the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

257.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and upward to the brain whilst transmitting signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

258.    The nerves responsible for collecting and relaying sensory information to the brain are called "sensory nerves," and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called "motor nerves."

67

259.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

260.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

261.    EMG tests and NCV tests are forms of electrodiagnostic tests. They were allegedly provided by Defendants ostensibly to determine whether the Patients had radiculopathies.

262.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists is dedicated solely to the scientific advancement of neuromuscular medicine. AANEM adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

263.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

### b)    The False Charges for NCV Tests

264.    NCV tests are tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

265.     EMG/NCV equipment documents the timing of the nerve response ("latency"), the magnitude of the response ("amplitude") and calculates the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another ("conduction velocity").

266.     In addition, the EMG/NCV equipment displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

267.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

268.     F-wave and H-reflex studies are types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

269.     According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all Patients is: (i) NCV tests of two sensory nerves; (ii) NCV tests of three motor nerves; and (iii) two H-reflex studies.

270.     Yet the Diagnostic Defendants routinely purported to perform testing on more nerves than suggested by the Recommended Policy solely to maximize billing.

271.     The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each Patient's unique circumstances.

69

272.     In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual Patient, as well as the real-time results obtained as the NCV tests are performed on peripheral nerves and their sensory and/or motor fibers.

273.     As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from Patient-to-Patient.

274.     This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each Patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

275.     This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

276.     Even so, the Diagnostic Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Patient. Instead, they purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers in the overwhelming majority of the NCV test claims identified in Exhibits 1, 2, 8, 11 and 6.

277.     There was no adequate neurological history and examination performed to create a foundation for the Diagnostic testing. The NCV tests were provided to Patients – if provided – as part of the pre-determined protocol designed to maximize the billing.

### c)     The Fraudulent Charges for EMG Tests

278.     As part of their fraudulent protocol the Diagnostic Defendants also provided medically unnecessary EMGs to virtually all Patients who received NCV tests.

279.     EMGs involve insertion of a needle into various muscles in the spinal area and in the arms and/or legs to measure electrical activity in each muscle. The electrical activity in each

muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

280.    According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all Patients is EMGs of two limbs.

281.    The Diagnostic Defendants billed for EMGs alleged used to determine whether the Patients suffered from radiculopathies. The EMGs were provided – if provided – as part of the Diagnostic Defendants' pre-determined treatment protocol designed to maximize the billing.

282.    The decision of how many limbs and which muscles to test in each limb should be tailored to each Patient's unique circumstances. This decision should be based upon a history and physical examination of each individual Patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from Patient-to-Patient.

283.    The Diagnostic Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each Patient. Instead, they routinely purported to test the same muscles in the same limbs repeatedly, without regard for individual Patients' presentation.

284.    Furthermore, even if there were any need for any of the EMGs, the nature and number of the EMGs that the Diagnostic Defendants alleged to provide and/or perform frequently grossly exceeded the maximum number of limbs tested – i.e., EMGs of two limbs – that are necessary in at least 90 percent of all Patients with a suspected diagnosis of radiculopathy.

285.    Nevertheless, the Diagnostic Defendants routinely purported to provide and/or perform EMGs on all four limbs on most Patients, in excess and contravention of the Recommended Policy, to maximize the fraudulent billing that they could submit.

286.     The supposed "results" of the Diagnostic Defendants' EMG tests were not incorporated into any Patient's treatment plan and played no genuine role in the care of the Patients.

287.     The Diagnostic Defendants almost always performed (or purported to perform) the EMG and NCV tests immediately following the initial examination or consultation.

288.     A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the Diagnostic Defendants to spend at least two hours with each Patient. The fact that each of the Patients subjected to the fraudulent EMG and NCV tests set aside two hours to receive a neurological examination and EMG and NCV tests indicates that either: (i) the Patients knew in advance that they were to receive the EMG and NCV tests because the EMG and NCV tests are rendered pursuant to a *pre-determined* treatment protocol, or (ii) the Diagnostic Defendants' EMG and NCV tests were not actually performed as billed.

### 4.     The Fraudulent Charges for VNG Tests

289.     Queens Medical, Pegasus Medical and to a lesser extent Northern Medical purported to subject Patients to videonystagmography ("VNG") tests.

290.     The charges for the VNG tests were fraudulent in that the VNG tests were medically unnecessary and were performed, if performed, pursuant to kickbacks given to the ABC Clinics.

291.     The Defendants billed the VNG tests through Queens Medical, Pegasus Medical, and occasionally Northern Medical, to ALLSTATE under CPT codes 92537, 92540, 92546, 92547, 92548, generally charging upwards of $2000.00 dollars for the combination of codes.

292.     Virtually every Patient who received VNG testing from Queens Medical, Pegasus Medical and Northern Medical also received TDT on the same date of service.

### a)     Legitimate Uses for VNG Tests

293.    VNG tests can be used to determine the cause of a Patient's vertigo or balance disorder in circumstances where there are no distinguishable causes for the Patient's condition.

294.    VNG tests are not used to confirm the existence of dizziness or balance disturbance, but rather to identify the origin of the condition in the rare cases where it cannot be determined through an Ear, Nose and Throat ("ENT") or neurological medical examination.

295.    VNG tests should not be used as a first-line diagnostic procedure when a Patient reports dizziness as the result of an automobile accident.  A valid diagnostic progression should begin with a physical examination, including an ENT and neurological examination.

296.    VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras. The Patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination. There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. Cameras record eye movements and display them on a video/computer screen.  The physician sees how the eyes move, which allows the physician to assess the Patient's balance, which helps the physician assess the source of vertigo.

297.    The Patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (except for heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants, as well as alcohol; and three hours of food

abstention. Patients must be provided with a pre-test history and examination, to determine – among other things – the nature of the problematic symptoms and the Patient's eye movements.

<b>b)        The Fraudulent VNG Test Charges</b>

298.    Notwithstanding the need for pre-test preparation, the Patients were referred to Queens Medical, Pegasus Medical and to a far lesser extent Northern Medical, received the VNG tests on the initial visit with Queens Medical, Pegasus Medical and Northern Medical without receiving the appropriate pre-test preparation.

299.    Virtually none of the Patients were referred to Queens Medical, Pegasus Medical or Northern Medical for VNG testing by an ENT doctor or any outside neurologist. In fact, the only neurologists who referred Queens Medical, Pegasus Medical and Northern Medical Patients for VNG testing was Ahmed or those acting on behalf of Queens Medical, Northern Medical and Pegasus Medical immediately following an initial consultation.

300.    Furthermore, in most cases where Queens Medical, Pegasus Medical and Northern Medical purported to provide VNG tests, the Patients did not report any unexplained dizziness as the result of an automobile accident.

301.    Indeed, many of the Patients who received VNG testing from Queens Medical, Northern Medical and Pegasus Medical did not report experiencing dizziness, imbalance, or vertigo in the medical examination reports that preceded the VNG testing.

302.    Moreover, even if a Patient reported the existence of some general form of dizziness or balance disorder, the VNG tests supposedly provided by Queens Medical, Northern Medical and Pegasus Medical were medically unnecessary because the cause of the Patient's dizziness or imbalance could be identified through the physical examinations that Queens Medical, Northern

Medical and Pegasus Medical routinely purported to provide and the Patient histories that it purported to take during every initial consultation and follow-up examination.

303.    No physician or healthcare provider associated with Queens Medical, Northern Medical and Pegasus Medical properly prepared the Patients for the tests. This, in turn, rendered the data that Queens Medical, Northern Medical and Pegasus Medical purported to obtain from the tests unreliable and useless.

304.    The data that Queens Medical, Northern Medical and Pegasus Medical obtained from the tests was not incorporated into any Patient's treatment plan. In virtually every case in which the VNG tests returned a positive result the Patient did not undergo any form of vestibular rehabilitation, balance retraining, or other therapy to address their presumed balance issues.

305.    Queens Medical's, Northern Medical's, and Pegasus Medical's VNG testing was part of the Defendants' fraudulent treatment and billing protocol designed solely to financially enrich Ahmed, the Doe Defendants and ABC Clinics.

**5.    <u>The Fraudulent Charges for Transcranial Doppler Testing</u>**

306.    Transcranial Doppler Testing ("TDT") is a noninvasive technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.

307.    TDT uses a doppler transducer that enables recording of blood velocities from intracranial arteries through selected cranial foramina and thin regions of the skull. Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

308.    TDT obtains information about the physiology of blood flow through the intracranial cerebrovascular system.

309.    Headaches, dizziness, and head trauma alone are not indications for TDT studies of the intracranial cerebrovascular system.

310.    TDT evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

• Vasospasm, following a ruptured brain aneurysm;

• Sickle cell anemia, to determine a Patient's risk of stroke;

• Ischemic stroke;

• Intracranial stenosis or blockage of the blood vessels;

• Cerebral microemboli; and/or

• Patent Foramen Ovale, a hole in the heart that doesn't close properly after birth, which may provoke embolic stroke.

311.    Depending on the type of measurement needed, TDT studies can take at least 45 minutes, if not more.

312.    In virtually every case where Queens Medical, Pegasus Medical and to a far lesser extent Northern Medical, purported to provide TDT the Patients did not suffer any sort of injury as the result of the automobile accident that would warrant the TDT.

313.    The TDT was part of Ahmed, the Doe Defendants' and the ABC Clinics, fraudulent treatment and billing protocol designed solely to financially enrich the Defendants.

**6.    The Fraudulent Charges for "Extracorporeal Shockwave Therapy"**

314.    Ahmed claims to subject Patients to medically unnecessary, experimental extracorporeal shockwave therapy ("ESWT") "treatments" that were performed through ECMC, Garden Medical, Go Medical and Town Medical (the "ESWT Defendants").

**a)    Overview of the ESWT Scheme**

76

315.    The Defendants masterminded their scheme after changes were adopted by the New York State Department of Financial Services ("DFS") regarding the application of the New York Workers Compensation Fee Schedule to New York's no-fault reimbursement.

316.    The Fee Schedule changes for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which had historically been a Category III Code (0101T), which meant that definitive reimbursement had not been established prior to October 2020.  Furthermore prior to October 2020, ESWT was virtually never performed on automobile accident Patients or billed to automobile insurers. The reasons behind this were two-fold: (i) the lack of established reimbursement; (ii) if properly performed ESWT required a sizeable investment, as well as direct involvement by a physician in the performance of the service and the use of physical equipment that is expensive and lacks portability.

317.    Extracorporeal Shockwave Therapy ("ESWT") has been used for decades in the field of Urology for the treatment of urinary stones. The "shockwave" delivered to the Patient is sufficiently strong to mechanically break up urinary stones into smaller stones that can be passed down the urinary tract and out of the body. Likewise, Extracorporeal shock wave lithotripsy is a procedure to break up stones inside the urinary tract, bile ducts or pancreatic duct with a series of shock waves generated by a machine called a lithotripter.

318.    Shockwaves are sound waves that have specific characteristics, including nonlinearity, high peak pressure followed by low tensile amplitude, short rise time, and short duration (10 ms). They have a single pulse, a wide frequency range (0-20 MHz), and a high-pressure amplitude (0-120 MPa).  In comparison to ultrasound waves, the shockwave peak pressure is approximately one thousand times greater than the peak pressure of an ultrasound

wave.  Further, therapeutic ultrasound utilizes high frequency sound waves, while ESWT utilizes lower frequency waves.

319.    Use of ESWT in musculoskeletal remains a Category III code. The use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.

320.    As a result of the above changes adopted by DFS regarding the application of the Workers Compensation Fee Schedule the Defendants shifted their medically unnecessary treatments from better regulated services to ESWT. In line with the above, Ahmed and the John and Jane Doe Defendants devised a fraudulent treatment and billing scheme pursuant to which:

(i)     unlicensed "technicians" would allegedly render the ESWT – falsely claiming on paper that the treatment was performed by Dr. Ahmed and in the case of Town Medical, Gelb – on a fugacious basis at a multiplicity of multidisciplinary "clinics" located throughout the New York metropolitan area;

(ii)    the reports, documents, and bills for thousands of dollars per Patient per date of treatment would be sent to New York automobile insurance companies, including ALLSTATE, seeking payment for the performance of the ESWT.

321.    The ESWT Defendants' billing under CPT code 0101T generally resulted in charges of approximately $700.00 for each ESWT treatment that they purported to provide.

322.    The ESWT Defendants typically claimed to provide two to three ESWT treatments per session, resulting in charges of approximately $1,400.00 to $2,100.00 per date of service.

323.    Further, the ESWT Defendants usually charged ALLSTATE for approximately two to four sessions of ESWT per Patient, resulting in charges ranging from approximately $2,400.00 to over $7,000.00 per Patient, with charges occasionally exceeding $10,000.00 per Patient. However, there are examples of extraordinary amounts of ESWT billing:

(i) In one instance, ALLSTATE was billed for a total of 21 units of ESWT occurring between February 5, 2021, through February 12, 2021, for charges totaling $14,699.58.

(ii) In another example, 42 units of ESWT were billed for a Patient between December 14, 2020, through February 12, 2021, resulting in charges totaling $29,399.16.

324.    With Town Medical, ESWT treatments now appear limited to one session but inspection of the billing indicates that upwards of 5 to 6 different ESWT providers are administering ESWT to the same Patient at the same location over a limited time.

325.    The Defendants often did not even actually provide ESWT that satisfied the requirements of CPT code 0101T. Instead, the Defendants provided Radial Pressure Wave Therapy whereas CPT Code 0101T, is reserved for "high energy" "shock wave" therapy." Radial Pressure Wave Therapy involves the low energy delivery of compressed air incapable of generating a true shock wave. It does not satisfy the requirements of CPT code 0101T.

326.    The ESWT Defendants utilized a portable, compact radial wave pressure device that is incapable of providing the high-energy capacity necessary to produce a true shock wave.

327. Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain much of the ESWT rendered by the ESWT Defendants did not provide high-energy ESWT treatments, but merely a form of pressure wave therapy that the ESWT Defendants fraudulently billed for under CPT code 0101T.

**b)    The ESWT Defendants Misrepresent that Ahmed and Gelb Perform the Treatment**

328.    Pursuant to the Fee Schedule, CPT code 0101T applies to "extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy."

329.    ESWT involves the delivery of shock waves to musculoskeletal areas of the body with the stated goal of reducing pain and promoting the healing of affected soft tissue.

330.     During ESWT treatment, the practitioner moves an applicator over a gel-covered treatment area.  As the applicator is moved over the treatment area, high energy shock waves allegedly stimulate the metabolism, enhance blood circulation, and accelerate the healing process.

331.     Defendants claimed to perform ESWT treatments on Patients allegedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

332.     Information contained in the NF-3 claims submissions submitted to ALLSTATE – at item or box 16 – corroborates the fraudulent nature of the billing wherein the ESWT Defendants claim that Ahmed and Gelb purport to have performed all the ESWT treatment.

333     Ahmed and Gelb provided none of the ESWT treatment.

334.     The claims submitted to ALLSTATE by the Defendants (NF-3 form) that falsely represented that Ahmed and Gelb performed ESWT "treatments" included "reports" that virtually always contained a duplicated mechanical signature for Ahmed and Gelb.

335.     Ahmed admitted under oath at the EUO of Garden Medical that he does not provide the actual treatment despite the misrepresentation on the billing:

Q. If you look at Box 16 of this bill where it states your name, what does that signify?

A. I'm the provider.

Q. Does that mean that you performed the service?

A. I'm sorry?

Q. Does that mean that you personally performed the treatment?

A. No, it means that I'm the provider, which is a medical doctor.

Q. On the billing that Garden Medical sends out, does it ever reflect the name of the PA, the nurse practitioner or the technician that performed the service?

A. No, because the bill is submitted to me, Omar Ahmed.

Q. Does the billing company have any way to know who was the individual who performed the service?

A. It's not relevant to them because I'm the doctor and the services are billed under me.

336.    Meanwhile box 16 of a standard form NF-3 entitled: "NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE" – clearly states at Box 16:

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE LICENSE OR CERTIFICATION NO. | BUSINESSRELATIONSHIP CHECK APPLICABLE BOX |
| --- | --- | --- |

The information is then provided in the appropriate column.  Under business relationship the legitimate provider has the choice of checking a box for "Employee;" "Independent Contractor;" or "Other."

337.    As such Ahmed is required to list the name and credentials of the person that provides the services as well as their employment status. Ahmed knows this because it is clearly written, and he has been operating in No Fault for well over a decade.  Ahmed lists his name in Box 16 to portray that he – a Medical Doctor – is providing the treatment instead of a host of unlicensed independent contractors.

338.    Ahmed testified that he reviewed practically every bill that went out.

Q. Do you review bills before they are sent out on behalf of Garden Medical?

A. Yes.

Q. Do you review all the bills that go out?

A. I do a lot of bills. I do the best you can.

81

Q. On Page 7 of this Exhibit 3, the provider signature, how is your name placed in there?

A. Electronically.

Q. When you reviewed the bill, is your name there already or is that something that you have to approve of?

A. It's something I have to review.

339.    Ahmed again admitted that his Patients came from layperson clinic managers.

Q. If we could walk through with a specific Patient, if a Patient were to come to you at Dr. Anand's office, for example, what is the process for how Garden Medical will examine the Patient, when do they decide whether shockwave is necessary? How does that work?

A. So if the NP or PA is at the office, the office is aware of that and as Patients go through the office that day seeing the various providers, they are asked to stop by and see the NP or PA, as well, before they leave. At that time the NP or PA does a consultation and based on the consultation the shockwave therapy is ordered.

340.    The consultation is a mere formality, and everyone gets shockwave therapy.

341.    As stated, the Defendants billed ALLSTATE under CPT code 0101T. The CPT code does not distinguish between a professional component and technical component, thus confirming that the service needs to be performed by a licensed physician to be reimbursable.  As such Ahmed and Gelb were falsely listed as providing the "treatment."

### c)      The ESWT Was Not Medically Necessary

342.    The use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; there are no **legitimate** peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of

82

musculoskeletal conditions therefore it is not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

343.    The Defendants ostensibly provided ESWT as part of a pre-determined protocol to virtually every Patient, without regard to each Patient's individual complaints or presentation. To wit the Defendants typically submitted a boilerplate, checklist treatment report containing a mechanical signature. The ESWT was provided to Patients soon after their accident without giving the Patients the opportunity to sufficiently respond to conservative therapies.

344.    In motor vehicle accident ("MVA") Patients, even legitimate providers who "believe" in ESWT efficacy typically try standard modalities and therapies before rushing to ESWT. In Patients with common musculoskeletal issues found in Patients involved in MVAs, the first line of treatment is a short course of rest, pain medication if needed, and anti-inflammatory medication or muscle relaxant medication if needed. The Patients who do not recover relatively quickly are moved on to passive modalities and active physical therapy treatments. Some physicians use chiropractic treatment or acupuncture instead of or in addition to physical therapy. These treatments usually assume the first 2-3 months of post-MVA treatment. This time is needed to see if the Patient will respond to this conservative regimen.

345.    The Defendants typically rendered ESWT to Patients less than twenty (20) days after the accidents, including the following examples:

(i)     Defendants purported to provide ESWT through Go Medical to a Patient named M.S. on April 12, 2023, only four days after the Patient's accident on April 8, 2023.

(ii)    Defendants purported to provide ESWT through Town Medical to a Patient named M.C. on May 5, 2021, only one day after the Patient's accident on May 4, 2021.

(iii)   Defendants purported to provide ESWT through ECMC to a Patient named W.P. on November 2, 2020, only fifteen days after the Patient's accident on October 16, 2020.

(iv)    Defendants purported to provide ESWT through Garden Medical to a Patient named D.W. on December 12, 2022, only six days after the Patient's accident on October 16, 2020.

346.    Indeed, the fraud is pervasively incestuous with Ahmed purportedly providing VNG and TDT testing at the same fraudulent clinic for Wilson Primary Medical Care PC wherein Ahmed also purported to provide service through two of the Provider Defendants for multiple units of ESWT and consultations through ECMC; and EMG/NCV diagnostic testing and consultations through ENS Medical virtually on the same days – all to Patient K.M.

347.    Meanwhile an entity known as Medical Care of Queensborough PC billed ALLSTATE for examinations/consultations allegedly performed by Gelb at the same clinic as Ahmed's Provider Defendant ECMC purported to provide multiple examinations/consultations and multiple ESWT treatments to Patient P.S.; all while Ahmed's Provider Defendant Queens Medical provided VNG and TDT as well as a consultation to Patient P.S.

348.    In addition, there was a lack of diagnostic clarity about what was specifically being treated by the ESWT Defendants.  In the case of a Patient with shoulder pain, for example, there are many causes of shoulder pain. It could be due to bicipital tendonitis, rotator cuff tendonitis, impingement syndrome, fracture, capsular contracture, deltoid strain, shoulder separation, etc. The treatment for each of these conditions is different. Just reporting that a Patient has shoulder pain is not a sufficient justification to begin any type of shoulder treatment, including ESWT. Modern musculoskeletal practice requires specific rather than symptom descriptive diagnoses.

349.    Further if a Patient undergoes a treatment like ESWT it is appropriate to wait to see if the treatment is helpful before repeating it. Some of the ESWT Defendants' Patients had treatments repeated every 7-14 days, with some one to two times per week or more.

350.    In all the claims identified in Exhibits 3, 4, 5 and 10 for ESWT, the Defendants falsely represented that the ESWT "treatments" were medically necessary.

### d)    The Fraudulent Charging Scheme

351.    The ESWT Defendants overcharged ESWT. Specifically, CPT Code 0101T only contemplates the billing for the code once per date of service no matter what portions – multiple portions – of the body to which the wand that emits the "shock waves" is applied.  To wit the code specifically describes the service as pertaining to the "musculoskeletal system," not a Patient's individual limbs or spine/trunk sections.  As such, by way of example, if one were applying the treatment to the right shoulder one unit could be charged according to the code.  However simply moving the wand to the left shoulder cannot result in charging for an additional unit.

352.    Despite the plain language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Patient's body to which the ESWT was performed. As such, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) times for virtually every date of service thereby depleting the Patients' No-Fault coverage with bogus "treatment."

### 7.    The Fraudulent "Outcome Assessment Testing"

353.    Modern Brooklyn caused bills to be submitted to ALLSTATE representing that the Defendants frequently subjected Patients to medically useless "outcome assessment tests" on or within a few days of the same date they purported to subject the Patients to examinations.

354.    Modern Brooklyn billed the "outcome assessment tests" to ALLSTATE using CPT code 99358, generally resulting in a charge of $560.24 for each round of "testing." They even purport to have provided this testing on New Year's Day of 2022.

355.    Like the Provider Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, if performed, pursuant to the illegal kickback schemes.

356.    The "outcome assessment tests" purportedly provided to Patients were pre-printed, multiple-choice questionnaires on which the Patients were invited to report the symptoms they were experiencing, and the impact of those symptoms on their daily lives.

357.    Since a Patient history and physical examination must be conducted as an element of a soft-tissue trauma Patient's initial and follow-up examinations, and since the "outcome assessment tests" purportedly provided were nothing more than a questionnaire regarding the Patients' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial and follow-up examinations.

358.    Healthcare providers cannot bill for an examination and then bill separately for contemporaneously provided "outcome assessment testing."

359.    In the event Defendants performed the "outcome assessment tests" the information gained using the tests would not have been significantly different from the information obtained during virtually every Patient's examination. In fact, Modern Brooklyn, in billing for initial and follow-up examinations, represented they took at least a "detailed" if not "comprehensive" Patient history and performed at least a "detailed" if not "comprehensive" physical examination.

360.    The "outcome assessment tests" duplicated the Patient histories and examinations purportedly conducted during the Patients' initial examinations and follow-up examinations.

361.    Modern Brooklyn's use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that

86

the physician spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Patient and the Patient's family.

362.     Though Modern Brooklyn the Defendants routinely submitted billing under CPT code 99358 for "outcome assessment tests," no physician associated with Modern Brooklyn spent an hour reviewing or administering the tests or communicating with the Patients or their families.

363.     Indeed, the "outcome assessment tests" did not require any physician involvement at all, since the "tests" simply were questionnaires that were completed by the Patients.

364.     Modern Brooklyn pervasively billed for outcome assessment testing, but the results of the tests were not incorporated into the Patients' respective treatment plans.

**8.     The Fraudulent Billing for Independent Contractor Services**

365.     The Defendants' fraud included the submission of claims to ALLSTATE on behalf of the Provider Defendants seeking payment for services provided by independent contractors.

366.     Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the owner themselves, or by their employees.

367.     Since 2001 DFS has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for services performed by independent contractors. *See* DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); *See also* DOI Opinion Letter, February 5, 2002; DOI Opinion Letter, March 11, 2002; DOI Opinion Letter, October 29, 2003; DOI Opinion Letter, March 21, 2005.

368.    The Provider Defendants routinely submitted charges to ALLSTATE and other insurers for Fraudulent Services that purportedly were performed by healthcare professionals and/or technicians other than Ahmed or the Provider Defendants' employees.

369.    The professionals and/or technicians working under the names of the Provider Defendants set their work schedules or had their schedules set for them by the Doe Defendants.

370.    The healthcare professionals and/or technicians working under the names of the Provider Defendants worked without any supervision by Ahmed or Gelb.

371.    The healthcare professionals and/or technicians working under the names of the Provider Defendants worked for as many as ten or more other non-Ahmed Providers.

372.    The independent contractor nature of the Provider Defendants' medical professionals is exemplified by the words of Ahmed at an EUO. Ahmed gave damaging testimony that indicated that his Shock Wave Therapy technicians are independent contractors given that he purports to rent Shock Wave therapy equipment from the technicians who own companies:

Q. Who do you rent the machines from?

A. Technicians have companies that rent machines.

373.    As to the qualifications of Ahmed's alleged employees that operate the shock wave machines Ahmed is unconvincing:

Q. How do you know that they have been trained by the company to operate the machine?

A. I ask them and they provide evidence.

Q. What evidence do they provide?

A. It could be a certificate, it could be an e-mail, it could be a writing, it could be verbally. There are many ways, but documentation.

"[V]erbally" is not documentation. Email is scant documentation. "[A] writing" is vague.  This is indicative of no process or procedure to manage employees because there are no employees.

374.    To the extent that they were even performed many of the Fraudulent Services were performed by people whom the Defendants treated as independent contractors.

375.    For instance, the Defendants:

(i)      paid the health care professionals and/or technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     paid no employee benefits to the health care professionals and/or technicians;

(iii)    failed to secure and maintain W-4 or I-9 forms for the health care professionals and/or technicians;

(iv)     failed to withhold federal, state, or city taxes on behalf of the health care professionals and/or technicians;

(v)      compelled the health care professionals to pay for their own malpractice insurance at their own expense if they had malpractice insurance at all;

(vi)     permitted the health care professionals and/or technicians to set their own schedules and days on which they desired to perform services;

(vii)    failed to cover the health care professionals and/or technicians for either unemployment or workers' compensation benefits; and

376.    By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)      avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(ii)     avoiding the need to secure any malpractice insurance; and

377.    Because the health care professionals and/or technicians were independent contractors the Provider Defendants never had any right to bill or collect PIP Benefits in connection with their services.

378.    The Defendants' misrepresentations consciously misled ALLSTATE into believing that it was obligated to pay for these services, when in fact ALLSTATE was not.

### 9.    The Defendants Fraudulent Billing for Services Rendered by Unsupervised Physician Assistants

379.    Pursuant to *Education Law § 6542(1)*, a physician assistant may perform medical services only under "continuous" supervision of a licensed physician. *Education Law § 6542(2)*.

380.    Pursuant to *10 N.Y.C.R.R. § 94.2*, "[a] physician supervising or employing a licensed physician assistant or registered specialist assistant shall remain medically responsible for the medical services performed by the licensed physician assistant ..."

381.    The Defendants hired physician assistants ("PAs"), who performed many of the Fraudulent Services on behalf of the Defendants at the Clinics.

382.    However, the PAs hired by the Defendants were not supervised by any licensed physician, including Ahmed or Gelb, when they purported to perform Fraudulent Services. There typically was not even a licensed physician present at any of the Clinics.

383.    To conceal the billing for services rendered by unsupervised PAs the bills submitted virtually never included the names of the PAs that rendered the Fraudulent Services, but instead listed Ahmed or Gelb as the physician or "treating provider."

### THE FRAUDULENT BILLING DEFENDANTS SUBMITTED OR CAUSED TO BE SUBMITTED TO ALLSTATE

384.    Defendants systematically caused to be submitted to ALLSTATE hundreds of NF-3 forms and other medical documents using the name of the Provider Defendants as well as their tax identification numbers seeking payment for the Fraudulent Services.

385.    The NF-3 forms, reports, assignment of benefits and other documents submitted to ALLSTATE on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, letters and other supporting documentation submitted to ALLSTATE by and on behalf of Defendants uniformly misrepresented that Ahmed and Gelb had performed or at least supervised, or at the very least controlled, the Fraudulent Services and that their name, license and the tax identification number of the Provider Defendants was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John and Jane Doe Defendants unlawfully and secretly controlled, operated and managed the Provider Defendants and their fraudulent referrals.

(ii)    The NF-3 forms, letters and other supporting documentation submitted to ALLSTATE by and on behalf of Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, letters and other supporting documentation submitted to ALLSTATE by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)   The NF-3 forms and other supporting documentation submitted to ALLSTATE on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – if provided – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

## DEFENDANTS' FRAUDULENT CONCEALMENT AND ALLSTATE'S JUSTIFIABLE RELIANCE

386.   The Provider Defendants, Ahmed and Gelb were obligated to act honestly in connection with the billing that they submitted, or caused to be submitted, to ALLSTATE.

387.   To induce ALLSTATE to pay the charges for the Fraudulent Services, the Defendants systematically made material misrepresentations to conceal their fraud.

388.   Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Ahmed and Gelb in the performance of the Fraudulent Services and Ahmed and Gelb's ownership, control and/or management of the Provider Defendants. Additionally, the

Defendants entered complex financial arrangements with one another that were designed to conceal the fact that the Defendants unlawfully exchanged kickbacks for Patient referrals.

389.    Furthermore, Defendants knowingly concealed facts to prevent ALLSTATE from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to pre-determined protocols designed to fraudulently maximize the charges that were submitted.

390.    ALLSTATE worked to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims were properly addressed and timely mailed. ALLSTATE is also under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially valid documents submitted to ALLSTATE in support of the charges at issue, combined with the material misrepresentations and fraudulent litigation activity described, were designed to, and did cause ALLSTATE to rely upon them. As a result, ALLSTATE incurred damages of more than $3.2 million based upon the fraudulent charges.

391.  Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from ALLSTATE, ALLSTATE did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**<u>FIRST CAUSE OF ACTION</u>**
**Against all Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

392.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

393.    There is an actual case in controversy between ALLSTATE and the Provider Defendants regarding more than $3,217,723.00 in illegal billing for Fraudulent Services that has been submitted to ALLSTATE.

394.    Defendants have no right to receive payment for any pending bills submitted to ALLSTATE because: (i) the Fraudulent Services were not medically necessary and were provided

pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Patients who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented the services that purportedly were provided to inflate the charges submitted to ALLSTATE (iii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the control and dictates of laypersons not licensed to render healthcare services; (iv) the Fraudulent Services were provided pursuant to illegal kickback payments made in exchange for Patient referrals; (v) Defendants have no right to receive payment for any pending bills submitted to ALLSTATE because, in many cases, the Fraudulent Services were provided by independent contractors, rather than by employees of the Provider Defendants; (vi) Ahmed, Gelb, Queens Medical, ECMC, Garden Medical, Modern Brooklyn, Northern Medical and Town Medical have no right to receive payment for any bills submitted to ALLSTATE because the Fraudulent Services were provided by unsupervised PAs.

395.    Accordingly, ALLSTATE requests a judgment pursuant to the _Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202_, declaring that Defendants have no right to receive payment for pending bills submitted to ALLSTATE under the names of the Provider Defendants.

## SECOND CAUSE OF ACTION
### Against Ahmed
### (Violation of RICO, 18 U.S.C. § 1962(c))

396.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

397.    ENS Medical is an ongoing "enterprise," as that term is defined in _18 U.S.C. § 1961(4)_, that engages in activities which affect interstate commerce.

398.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of ENS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, _18 U.S.C. § 1341_, based upon the use of the United

93

States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ENS Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that ENS Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and ENS Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) ENS Medical obtained its Patients through the illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by ENS Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 1.

399.    ENS Medical's business is racketeering activity since the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated ENS Medical, because ENS Medical never was eligible to bill for or collect No-Fault Benefits in the first place; and acts of mail fraud therefore were essential for ENS Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

Defendants continue to attempt collection on the fraudulent billing submitted through ENS Medical to the present day.

400.    ENS Medical is engaged in inherently unlawful acts because it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by ENS Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

401.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,284.00 to ENS pursuant to the fraudulent bills submitted by the Defendants through ENS Medical.

402.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

403.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

404.    ENS Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

405.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with the ENS Medical enterprise.

406.    Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ENS Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years

seeking payments that ENS Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that ENS Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and ENS Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the services were performed and billed pursuant to a pre-determined treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented the level of services that were provided to inflate the charges that could be submitted; (v) ENS Medical obtained its Patients through the Defendants' kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by ENS Medical's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 1.

407.     Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

408.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,284.00 to ENS pursuant to the fraudulent bills submitted.

409.     ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Ahmed and ENS Medical
### (Common Law Fraud)

410.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

411.    Ahmed and ENS Medical intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

412.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ENS Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and ENS Medical obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; and (iv) in every claim, the representation that the billed-for services were provided by employees of ENS Medical, when in fact many of the billed-for services were provided by independent contractors.

413.    Ahmed and ENS Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through ENS Medical that were not compensable under the No-Fault Laws.

97

414.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,284.00 to ENS pursuant to the fraudulent bills submitted by Defendants through ENS Medical.

415.     Ahmed and ENS Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

416.     Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Ahmed and ENS Medical**
**(Unjust Enrichment)**

417.     ALLSTATE incorporates each allegation in the paragraphs set forth above.

418.     As set forth above, Ahmed and ENS Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

419.     When ALLSTATE paid the bills and charges submitted by or on behalf of ENS Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' representations.

420.     Ahmed and ENS Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

421.     Ahmed and ENS Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

422.     By reason of the above, Ahmed and ENS Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $156,284.00 paid to ENS.

**SIXTH CAUSE OF ACTION**
**Against John and Jane Doe Defendants and ABC Clinics**
**(Aiding and Abetting Fraud)**

423.    ALLSTATE incorporates each allegation set forth above.

424.    The John and Jane Doe Defendants and the ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and ENS Medical.

425.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of ENS Medical; (ii) knowingly referring Patients to ENS Medical in exchange for illegal kickbacks from Ahmed, ENS Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits.

426.    The conduct of the John and Jane Doe Defendants and the ABC Clinics in furtherance of the scheme was significant and material. Said conduct was necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or ENS Medical to obtain Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE for the Fraudulent Services.

427.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and ENS Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

428.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $156,284.00 paid to ENS pursuant to the fraudulent bills submitted through ENS Medical.

429.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

430.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
#### Against Ahmed
#### (Violation of RICO, 18 U.S.C. § 1962(c))

431.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

432.    Queens Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4),* that engages in activities which affect interstate commerce.

433.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Queens Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Queens Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Queens Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Queens Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to

100

inflate the charges that could be submitted; (v) Queens Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if even provided – by independent contractors, rather than by Queens Medical's employees and (vii) in many cases, the billed-for services were provided – if even provided – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to ALLSTATE comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 2.

434.    Queens Medical's business is racketeering activity since the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Queens Medical, because Queens Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Queens Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Queens Medical to the present day.

435.    Queens Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Queens Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

436.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $239,859.00 pursuant to the fraudulent bills submitted by the Defendants through Queens Medical.

437.   ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Ahmed and John and Jane and Jane Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

438.   ALLSTATE incorporates every allegation in the paragraphs set forth above.

439.   Queens Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

440.   Ahmed and the John and Jane Doe Defendants are employed by and/or associated with the Queens Medical enterprise.

441.   Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Queens Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Queens Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Queens Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Queens Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services

102

that purportedly were provided in order to inflate the charges that could be submitted; (v) Queens Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Queens Medical's employees; and (vii) in many cases, the billed-for services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 2.

442.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to ALLSTATE.

443.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it paid at least $239,859.00 pursuant to the fraudulent bills submitted by Defendants through Queens Medical.

444.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

**<u>NINTH CAUSE OF ACTION</u>**
**Against Ahmed and Queens Medical**
**(Common Law Fraud)**

445.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

446.    Ahmed and Queens Medical intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

447.   The false statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Queens Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Queens Medical obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; (iii) in every claim, the representation that the billed-for services were provided by employees of Queens Medical, when in fact many of the billed-for services were provided by independent contractors; and (iv) in many cases, the billed-for services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws.

448.   Ahmed and Queens Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Queens Medical that were not compensable under the No-Fault Laws.

449.   ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $239,859.00 pursuant to the fraudulent bills submitted by Defendants through Queens Medical.

450.   Ahmed and Queens Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

451.   Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Ahmed and Queens Medical
### (Unjust Enrichment)

452.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

453.    As set forth above, Ahmed and Queens Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

454.    When ALLSTATE paid the bills and charges submitted by or on behalf of Queens Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

455.    Ahmed and Queens Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Ahmed and Queens Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

456.    Ahmed and Queens Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

457.    By reason of the above, Ahmed and Queens Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $239,859.00.

## ELEVENTH CAUSE OF ACTION
### Against the John and Jane Doe Defendants and ABC Clinics
### (Aiding and Abetting Fraud)

458.    ALLSTATE incorporates every allegation set forth above.

459.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Queens Medical.

460.    The acts of John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included: (i) the operation and control of Queens Medical; (ii) knowingly referring Patients to Queens Medical in exchange for illegal kickbacks from Ahmed, Queens

Medical, and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits without regard to Patient care.

461.    The conduct of John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of John and Jane Doe Defendants and ABC Clinics was a necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or Queens Medical to obtain Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE for the Fraudulent Services.

462.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Queens Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

463.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $239,859.00 pursuant to the fraudulent bills submitted through Queens Medical.

464.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

465.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Ahmed
### (Violation of RICO, 18 U.S.C. § 1962(c))

466.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

467. ECMC is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

468. Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of ECMC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ECMC was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that ECMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and ECMC obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) ECMC Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by ECMC Medical's employees; and (vii) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 3.

469.    ECMC's business is racketeering activity, because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated ECMC, since ECMC never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for ECMC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through ECMC to the present day.

470.    ECMC is engaged in inherently unlawful acts because it continues to attempt collection of fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by ECMC in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

471.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,049.00 pursuant to the fraudulent bills submitted by the Defendants through ECMC.

472.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

473.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

474.    ECMC is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

475.    Ahmed and the John and Jane Doe Defendants are employed by and/or associated with the ECMC enterprise.

476.     Ahmed and John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ECMC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that ECMC was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that ECMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and ECMC Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) ECMC obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by ECMC's employees; and (vii) in many cases, the billed-for services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 3.

477.     Ahmed and John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to ALLSTATE.

478.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,049.00 pursuant to the fraudulent bills submitted by Defendants through ECMC.

479.     ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to _18 U.S.C. §1964(c)_, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Ahmed and ECMC
### (Common Law Fraud)

480.     ALLSTATE incorporates every allegation in the paragraphs set forth above.

481.     Ahmed and ECMC intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

482.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ECMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to _Insurance Law § 5102(a)(1)_ and _11 N.Y.C.R.R. § 65-3.16(a)(12)_, when in fact it was not properly licensed and it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich ECMC and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing

110

codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; (iv) in every claim, the representation that the billed-for services were provided by employees of ECMC, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.

483.    Ahmed and ECMC intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through ECMC that were not compensable under the No-Fault Laws.

484.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,049.00 pursuant to the fraudulent bills submitted by Defendants through ECMC.

485.    Ahmed and ECMC's extensive fraudulent conduct demonstrate a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

486.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Ahmed and ECMC**
**(Unjust Enrichment)**

487.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

488.    As set forth above, Ahmed and ECMC have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

489.    When ALLSTATE paid the bills and charges submitted by or on behalf of ECMC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

490.    Ahmed and ECMC have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Ahmed and ECMC voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

491.    Ahmed and ECMC's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

492.    By reason of the above, Ahmed and ECMC have been unjustly enriched in an amount to be determined at trial, but in no event less than **$ paid to ECMC**.

## SIXTEENTH CAUSE OF ACTION
### Against the John and Jane Doe Defendants and ABC Clinics
### (Aiding and Abetting Fraud)

493.    ALLSTATE incorporates every allegation set forth above.

494.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and ECMC.

495.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of ECMC; (ii) knowingly referring Patients to Queens Medical in exchange for illegal kickbacks from Ahmed, ECMC Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined treatment protocol to maximize profits without regard to Patient care.

496.    The conduct of John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of John and Jane Doe Defendants and ABC Clinics was necessary and critical to the success of the scheme because, without their

112

actions, there would have been no opportunity for Ahmed or ECMC to obtain Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

497.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and ECMC for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

498.    The conduct of John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $180,049.00 pursuant to the fraudulent bills submitted through ECMC.

499.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ECMC to recover punitive damages.

500.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**SEVENTEENTH CAUSE OF ACTION**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

501.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

502.    Garden Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

503.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Garden Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Garden Medical was not eligible to

receive under the No-Fault Laws because: (i) in every claim, the representation that Garden Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Garden Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Garden Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Garden Medical's employees; and (vii) in many cases, the billed-for-services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 4.

504. Garden Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Garden Medical, since Garden Medical was never eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Garden Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that

Defendants continue to attempt collection on the fraudulent billing submitted through Garden Medical to the present day.

505.    Garden Medical is engaged in inherently unlawful acts because it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Garden Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE through fraudulent no-fault billing.

506.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $125,418.00 pursuant to the fraudulent bills submitted by the Defendants through Garden Medical.

507.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

508.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

509.    Garden Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

510.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Garden Medical enterprise.

511.    Ahmed and John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Garden Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years

seeking payments that Garden Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Garden Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Garden Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Garden Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Garden Medical's employees; and (vii) in many cases, the billed-for services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 4.

512.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to ALLSTATE.

513.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $125,418.00 pursuant to the fraudulent bills submitted by Defendants through Garden Medical.

514.   ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against Ahmed and Garden Medical**
**(Common Law Fraud)**

515.   ALLSTATE incorporates every allegation in the paragraphs set forth above.

516.   Ahmed and Garden Medical intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

517.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Garden Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Garden Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; (iv) in every claim, the representation that the billed-for services were provided by employees of Garden Medical, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided

117

– to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws.

518.    Ahmed and Garden Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Garden Medical that were not compensable under the No-Fault Laws.

519.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $125,418.00 pursuant to the fraudulent bills submitted by Defendants through Garden Medical.

520.    Ahmed and Garden Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

521.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
### Against Ahmed and Garden Medical
### (Unjust Enrichment)

522.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

523.    As set forth above, Ahmed and Garden Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

524.    When ALLSTATE paid the bills and charges submitted by or on behalf of Garden Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

525.    Ahmed and Garden Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Ahmed and Garden Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

118

526.    Ahmed and Garden Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

527.    By reason of the above, Ahmed and Garden Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $125,418.00.

### TWENTY-FIRST CAUSE OF ACTION
### Against the John and Jane Doe Defendants and ABC Clinics
### (Aiding and Abetting Fraud)

528.    ALLSTATE incorporates each allegation set forth above.

529.    John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Garden Medical.

530.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of ECMC; (ii) knowingly referring Patients to Queens Medical in exchange for illegal kickbacks from Ahmed, ECMC Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits.

531.    The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the scheme was significant and material. The conduct of John and Jane Doe Defendants and ABC Clinics was necessary and critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Garden Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

532.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and

119

Garden Medical for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

533.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $125,418.00 pursuant to the fraudulent bills submitted through Garden Medical.

534.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

535.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

536.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

537.    Town Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

538.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Town Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Town Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Town Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render

120

healthcare services and Town Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Town Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Town Medical's employees; and (vii) in many cases, the billed-for services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 5.

539.   Town Medical's business is racketeering activity since the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Town Medical, because Town Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Town Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Town Medical to the present day.

540.   Town Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently

unlawful acts are taken by Town Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

541.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $135,129.00 pursuant to the fraudulent bills submitted by the Defendants through Town Medical.

542.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Ahmed, Gelb, and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

543.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

544.    Town Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

545.    Ahmed, Gelb, and John and Jane Doe Defendants are employed by and/or associated with the Town Medical enterprise.

546.    Ahmed, Gelb, and John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Town Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Town Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Town Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services

122

were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Town Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Town Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Town Medical's employees; and (vii) in many cases, the billed-for services were provided – to the extent they were provided at all – by unsupervised PAs, in violation of material licensing laws. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 5.

547.    Ahmed, Gelb, and John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to ALLSTATE.

548.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $135,129.00 pursuant to the fraudulent bills submitted by Defendants through Town Medical.

549.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

123

## TWENTY-FOURTH CAUSE OF ACTION
### Against Ahmed and Town Medical
### (Common Law Fraud)

550.     ALLSTATE incorporates every allegation in the paragraphs set forth above.

551.     Ahmed and Town Medical intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

552.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Town Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Town Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; (iv) in every claim, the representation that the billed-for services were provided by employees of Town Medical, when in fact many of the billed-for services were provided by independent contractors; and (vi) in many cases, the billed-for services were provided – if provided at all – by unsupervised PAs, in violation of material licensing laws.

124

553.    Ahmed and Town Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Town Medical that were not compensable under the No-Fault Laws.

554.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $135,129.00 pursuant to the fraudulent bills submitted by Defendants through Town Medical.

555.    Ahmed and Town Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

556.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Ahmed, Gelb, and Town Medical
### (Unjust Enrichment)

557.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

558.    As set forth above, Ahmed, Gelb, and Town Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

559.    When ALLSTATE paid the bills and charges submitted by or on behalf of Town Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

560.    Ahmed, Gelb, and Town Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Ahmed, Gelb, and Town Medical voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

561.   Ahmed, Gelb, and Town Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

562.   By reason of the above, Ahmed, Gelb, and Town Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $135,129.00.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Gelb, John and Jane Doe Defendants and the ABC Clinics**
**(Aiding and Abetting Fraud)**

563.   ALLSTATE incorporates every allegation set forth above.

564.   Gelb, John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Town Medical.

565.   The acts of Gelb in furtherance of the fraudulent scheme included, among other things, agreeing to serve as nominal owner of Town Medical when she knew was not receiving any beneficial ownership or control, allowing her name and medical license to be listed on Town Medical's billing as owner, and allowing her name to be listed on Town Medical's billing as the treating provider even though she rarely, if ever, rendered any of the Fraudulent Services billed through Town Medical.

566.   The acts of John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Town Medical; (ii) knowingly referring Patients to Town Medical in exchange for illegal kickbacks from Ahmed, Town Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits.

567.   The conduct of Gelb, John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of Gelb was a necessary part of and was critical to the success of the fraudulent scheme because her actions

126

allowed Ahmed to conceal the nature and extent of Town Medical's association with the fraudulent scheme and, thus, allowed Town Medical to receive more payments from ALLSTATE, and likely other no-fault insurance carriers, than it would have had its association with Ahmed been readily identifiable. Likewise, the conduct of John and Jane Doe Defendants and ABC Clinics was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Town Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

568.    Gelb, the John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Town Medical for medically unnecessary, illusory, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

569.    The conduct of Gelb, the John and Jane Doe Defendants and ABC Clinic caused ALLSTATE to pay more than $135,129.00 pursuant to the fraudulent bills submitted through Town Medical.

570.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

571.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**<u>TWENTY-SEVENTH CAUSE OF ACTION</u>**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

572.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

573.    Atlantic Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

574.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Atlantic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Atlantic Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Atlantic Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Atlantic Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Atlantic Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Atlantic Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 6.

575.    Atlantic Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Atlantic Medical since Atlantic Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Atlantic Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Atlantic Medical to the present day.

576.    Atlantic Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Atlantic Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

577.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,770.00 pursuant to the fraudulent bills submitted by the Defendants through Atlantic Medical.

578.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

579.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

580.    Atlantic Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

129

581.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Atlantic Medical enterprise.

582.    Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Atlantic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Atlantic Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Atlantic Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Atlantic Medical obtained Patients through a kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented the level of services that were provided to inflate the charges that could be submitted; (v) Atlantic Medical obtained its Patients through the Defendants' kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided – by independent contractors, rather than by Atlantic Medical's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed as Exhibit 6.

583.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

584.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,770.00 pursuant to the fraudulent bills submitted by Defendants through Atlantic Medical.

585.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Ahmed and Atlantic Medical
### (Common Law Fraud)

586    ALLSTATE incorporates each allegation in the paragraphs set forth above.

587.    Ahmed and Atlantic Medical intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

588.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Atlantic Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and that it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Atlantic Medical and Ahmed; (iii) in every claim, the

131

representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; and (iv) in every claim, the representation that the billed-for services were provided by employees of Atlantic Medical, when in fact many of the billed-for services were provided by independent contractors.

589.    Ahmed and Atlantic Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Atlantic Medical that were not compensable under the No-Fault Laws.

590.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,770.00 pursuant to the fraudulent bills submitted by Defendants through Atlantic Medical.

591.    Ahmed and Atlantic Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

592.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### THIRTIETH CAUSE OF ACTION
**Against Ahmed and Atlantic Medical**
**(Unjust Enrichment)**

593.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

594.    As set forth above, Ahmed and Atlantic Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

595.    When ALLSTATE paid the bills and charges submitted by or on behalf of Atlantic Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

596.    Ahmed and Atlantic Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

597.    Ahmed and Atlantic Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

598.    By reason of the above, Ahmed and Atlantic Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $147,770.00.

<u>THIRTY-FIRST CAUSE OF ACTION</u>
**Against the John and Jane Doe Defendants and ABC Clinics**
**(Aiding and Abetting Fraud)**

599.    ALLSTATE incorporates each allegation set forth above.

600.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Atlantic Medical.

601.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Atlantic Medical; (ii) knowingly referring Patients to Atlantic Medical in exchange for illegal kickbacks from Ahmed, Town Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits without regard to Patient care.

602.    The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe

133

Defendants and ABC Clinics was necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or Atlantic Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

603.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Atlantic Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

604.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $147,770.00 pursuant to the fraudulent bills submitted through Atlantic Medical.

605.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

606.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-SECOND CAUSE OF ACTION
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

607.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

608.    Modern Brooklyn is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

609.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Modern Brooklyn's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the

United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Modern Brooklyn was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Modern Brooklyn was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Modern Brooklyn obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Modern Brooklyn obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Modern Brooklyn's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 7.

610.    Modern Brooklyn's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Modern Brooklyn since Modern Brooklyn never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Modern Brooklyn to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the

fact that Defendants continue to attempt collection on the fraudulent billing submitted through Modern Brooklyn to the present day.

611.   Modern Brooklyn is engaged in inherently unlawful acts as it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Modern Brooklyn in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

612.   ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $442,027.00 pursuant to the fraudulent bills submitted by the Defendants through Modern Brooklyn.

613.   ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

**THIRTY-THIRD CAUSE OF ACTION**
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

614.   ALLSTATE incorporates each allegation in the paragraphs set forth above.

615.   Modern Brooklyn is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

616.   Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Modern Brooklyn enterprise.

617.   Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Modern Brooklyn's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two

136

years seeking payments that Modern Brooklyn was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Modern Brooklyn was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Modern Brooklyn obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Modern Brooklyn obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if they were provided at all – by independent contractors, rather than by Modern Brooklyn's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 7.

618.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

619.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $442,027.00 pursuant to the fraudulent bills submitted by Defendants through Modern Brooklyn.

620.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

137

## THIRTY-FOURTH CAUSE OF ACTION
### Against Ahmed and Modern Brooklyn
### (Common Law Fraud)

621.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

622.    Ahmed and Modern Brooklyn intentionally and knowingly made false statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

623.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Modern Brooklyn was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Modern Brooklyn and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Modern Brooklyn; and (iv) in every claim, the representation that the billed-for services were provided by employees of Modern Brooklyn, when in fact many of the billed-for services were provided by independent contractors.

624.    Ahmed and Modern Brooklyn intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Modern Brooklyn that were not compensable under the No-Fault Laws.

625.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $442,027.00 pursuant to the fraudulent bills submitted by Defendants through Modern Brooklyn.

626.    Ahmed and Modern Brooklyn's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

627.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-FIFTH CAUSE OF ACTION**
**Against Ahmed and Modern Brooklyn**
**(Unjust Enrichment)**

628.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

629.    As set forth above, Ahmed and Modern Brooklyn have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

630.    When ALLSTATE paid the bills and charges submitted by or on behalf of Modern Brooklyn for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

631.    Ahmed and Modern Brooklyn have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

632.    Ahmed and Modern Brooklyn's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

633.    By reason of the above, Ahmed and Modern Brooklyn have been unjustly enriched in an amount to be determined at trial, but in no event less than $442,027.00.

## THIRTY-SIXTH CAUSE OF ACTION
### Against the John and Jane Doe Defendants and ABC Clinics
### (Aiding and Abetting Fraud)

634.    ALLSTATE incorporates each allegation set forth above.

635.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Modern Brooklyn.

636.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Modern Brooklyn; (ii) knowingly referring Patients to Modern Brooklyn in exchange for illegal kickbacks from Ahmed, Modern Brooklyn, and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits.

637.    The conduct of the John and Jane Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Modern Brooklyn to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

638.    The John and Jane Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Modern Brooklyn for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

639.    The conduct of the John and Jane Doe Defendants caused ALLSTATE to pay more than $442,027.00 pursuant to the fraudulent bills submitted through Modern Brooklyn.

640.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

641.     Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-SEVENTH CAUSE OF ACTION**
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

642.     ALLSTATE incorporates every allegation in the paragraphs set forth above.

643.     Terrace Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

644.     Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Terrace Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Terrace Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Terrace Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Terrace Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to

141

inflate the charges that could be submitted; and (v) Terrace Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Terrace Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 8.

645.    Terrace Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Terrace Medical since Terrace Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Terrace Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Terrace Medical to the present day.

646.    Terrace Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Terrace Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

647.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,941.00 pursuant to the fraudulent bills submitted by the Defendants through Terrace Medical.

648.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

## THIRTY-EIGHTH CAUSE OF ACTION
### Against Ahmed and John and Jane Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

649.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

650.    Terrace Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. §*
*1961(4)*, that engaged in activities which affected interstate commerce.

651.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with
the Terrace Medical enterprise.

652.    Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined
and conspired to conduct and/or participate, directly or indirectly, in the conduct of Terrace
Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the
federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to
submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two
years seeking payments that Terrace Medical was not eligible to receive under the No-Fault Laws
because: (i) in every claim, the representation that Terrace Medical was properly licensed, and
therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11*
*N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services
were provided pursuant to the dictates of laypersons not licensed to render healthcare services and
Terrace Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services
were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a
pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants;
(iv) the billing codes used for the services misrepresented and exaggerated the level of services
that purportedly were provided in order to inflate the charges that could be submitted; (v) Terrace
Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many

cases, the billed-for services were provided – if even provided – by independent contractors, rather

than by Terrace Medical's employees. The fraudulent bills and corresponding mailings submitted

to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this

Complaint are described in the chart annexed hereto as Exhibit 8.

653.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in

furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of

money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

654.    ALLSTATE has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $19,941.00pursuant to the fraudulent bills submitted

by Defendants through Terrace Medical.

655.    By reason of its injury, ALLSTATE is entitled to treble damages, costs, and

reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems

just and proper.

### THIRTY-NINTH CAUSE OF ACTION
**Against Ahmed and Terrace Medical**
**(Common Law Fraud)**

656.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

657.    Ahmed and Terrace Medical intentionally and knowingly made false and fraudulent

statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during

their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

658.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Terrace Medical was properly

licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law §*

*5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and it

obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined protocol designed solely to enrich Terrace Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to ALLSTATE; and (iv) in every claim, the representation that the billed-for services were provided by employees of Terrace Medical, when in fact many of the billed-for services were provided by independent contractors.

659.    Ahmed and Terrace Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Terrace Medical that were not compensable under the No-Fault Laws.

660.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $19,941.00 pursuant to the fraudulent bills submitted by Defendants through Terrace Medical.

661.    Ahmed and Terrace Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

662.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### FORTIETH CAUSE OF ACTION
**Against Ahmed and Terrace Medical**
**(Unjust Enrichment)**

663.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

664.    As set forth above, Ahmed and Terrace Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

665.    When ALLSTATE paid the bills and charges submitted by or on behalf of Terrace Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

666.    Ahmed and Terrace Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

667.    Ahmed and Terrace Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

668.    By reason of the above, Ahmed and Terrace Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $19,941.00.

## FORTY-FIRST CAUSE OF ACTION
### Against the John and Jane Doe Defendants and ABC Clinics
### (Aiding and Abetting Fraud)

669.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

670.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Terrace Medical.

671.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Terrace Medical; (ii) knowingly referring Patients to Terrace Medical in exchange for illegal kickbacks from Ahmed, Terrace Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits without regard to Patient care.

146

672.    The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe Defendants and ABC Clinics was necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or Terrace Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

673.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Terrace Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

674.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $19,941.00 pursuant to the fraudulent bills submitted through Terrace Medical.

675.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

676.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### FORTY-SECOND CAUSE OF ACTION
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

677.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

678.    Pegasus Medical is an ongoing "enterprise," as that term is defined in _18 U.S.C. § 1961(4)_, that engages in activities which affect interstate commerce.

679.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Pegasus Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Pegasus Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Pegasus Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Pegasus Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Pegasus Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Pegasus Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 9.

680.    Pegasus Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Pegasus Medical since Pegasus Medical never was eligible

to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Pegasus Medical to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Pegasus Medical to the present day.

681.    Pegasus Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Pegasus Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

682.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,334.00 pursuant to the fraudulent bills submitted by the Defendants through Pegasus Medical.

683.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to _18 U.S.C. § 1964(c)_, and any other relief the Court deems just and proper.

### FORTY-THIRD CAUSE OF ACTION
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

684.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

685.    Pegasus Medical is an ongoing "enterprise," as that term is defined in _18 U.S.C. § 1961(4)_, that engaged in activities which affected interstate commerce.

686.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Pegasus enterprise.

687.    Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Pegasus

Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Pegasus Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Pegasus Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Pegasus Medical obtained Patients through an illegal kickback scheme; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Pegasus Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Pegasus Medical's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 9.

688.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

689.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,334.00 pursuant to the fraudulent bills submitted by Defendants through Pegasus Medical.

690.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

## FORTY-FOURTH CAUSE OF ACTION
### Against Ahmed and Pegasus Medical
### (Common Law Fraud)

691.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

692.    Ahmed and Pegasus Medical intentionally and knowingly made false statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

693.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Pegasus Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and that it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Pegasus Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Pegasus Medical; and (iv) in every claim, the representation that the billed-

for services were provided by employees of Pegasus Medical, when in fact many of the billed-for services were provided by independent contractors.

694.     Ahmed and Pegasus Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Pegasus Medical that were not compensable under the No-Fault Laws.

695.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $114,334.00 pursuant to the fraudulent bills submitted by Defendants through Pegasus Medical.

696.     Ahmed and Pegasus Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

697.     Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### FORTY-FIFTH CAUSE OF ACTION
**Against Ahmed and Pegasus Medical
(Unjust Enrichment)**

698.     ALLSTATE incorporates each allegation in the paragraphs set forth above.

699.     As set forth above, Ahmed and Pegasus Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

700.     When ALLSTATE paid the bills and charges submitted by or on behalf of Pegasus Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

701.     Ahmed and Pegasus Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

702.    Ahmed and Pegasus Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

703.    By reason of the above, Ahmed and Pegasus Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $114,334.00.

**FORTY-SIXTH CAUSE OF ACTION**
**Against the John and Jane Doe Defendants and ABC Clinics**
**(Aiding and Abetting Fraud)**

704.    ALLSTATE incorporates each allegation set forth above.

705.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Pegasus Medical.

706.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Pegasus Medical; (ii) knowingly referring Patients to Pegasus Medical in exchange for illegal kickbacks from Ahmed, Pegasus Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits.

707.    The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe Defendants and ABC Clinics was necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or Pegasus Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

708.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and

153

Pegasus Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

709.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $114,334.00 pursuant to the fraudulent bills submitted through Pegasus Medical.

710.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

711.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

<u>FORTY-SEVENTH CAUSE OF ACTION</u>
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

712.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

713.    Go Medical is an ongoing "enterprise," as that term is defined in <u>*18 U.S.C. § 1961(4)*</u>, that engages in activities which affect interstate commerce.

714.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Go Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, <u>*18 U.S.C. § 1341*</u>, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Go Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Pegasus Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to <u>*Insurance Law § 5102(a)(1)*</u> and <u>*11 N.Y.C.R.R. § 65-3.16(a)(12)*</u>, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render

154

healthcare services and Pegasus Medical obtained Patients through an illegal kickback scheme (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Go Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Go Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 10.

715.    Go Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Go Medical since Go Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Go Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Go Medical to the present day.

716.    Go Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE and other insurers. These inherently unlawful acts are taken by Go Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

717.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,479.00 pursuant to the fraudulent bills submitted by the Defendants through Go Medical.

718.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

### FORTY-EIGHTH CAUSE OF ACTION
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

719.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

720.    Go Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

721.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Go Medical enterprise.

722.    Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Go Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Go Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Go Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Go Medical obtained Patients through a kickback scheme; (ii) the billed-for-services were not medically

156

necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented the level of services that were provided to inflate the charges that could be submitted; (v) Go Medical obtained its Patients through the Defendants' kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided – by independent contractors, rather than by Go Medical's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 10.

723.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

724.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,479.00 pursuant to the fraudulent bills submitted by Defendants through Go Medical.

725.    ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

### FORTY-NINTH CAUSE OF ACTION
**Against Ahmed and Go Medical**
**(Common Law Fraud)**

726.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

727.    Ahmed and Go Medical intentionally and knowingly made false and fraudulent statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

728. The false statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Go Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and that it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Go Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Go Medical; and (iv) in every claim, the representation that the billed-for services were provided by employees of Go Medical, when in fact many of the billed-for services were provided by independent contractors.

729. Ahmed and Go Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Go Medical that were not compensable under the No-Fault Laws.

730. ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $130,479.00 pursuant to the fraudulent bills submitted by Defendants through Go Medical.

731. Ahmed and Go Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

732. Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

158

**FIFTIETH CAUSE OF ACTION**
**Against Ahmed and Go Medical**
**(Unjust Enrichment)**

733.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

734.    As set forth above, Ahmed and Go Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

735.    When ALLSTATE paid the bills and charges submitted by or on behalf of Go Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

736.    Ahmed and Go Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

737.    Ahmed and Go Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

738.    By reason of the above, Ahmed and Go Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $130,479.00.

**FIFTY-FIRST CAUSE OF ACTION**
**Against the John and Jane Doe Defendants and ABC Clinics**
**(Aiding and Abetting Fraud)**

739.    ALLSTATE incorporates each allegation set forth above.

740.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Go Medical.

741.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Go Medical; (ii) knowingly referring Patients to Go Medical in exchange for illegal kickbacks from Ahmed, Go

159

Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits.

742.    The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe Defendants and ABC Clinics was necessary and critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Ahmed or Go Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

743.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Go Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

744.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $130,479.00 pursuant to the fraudulent bills submitted through Go Medical.

745.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

746.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTY-SECOND CAUSE OF ACTION
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

747.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

748.    Northern Medical is an ongoing "enterprise," as that term is defined in _18 U.S.C. §_ _1961(4)_, that engages in activities which affect interstate commerce.

749.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Northern Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Northern Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Northern Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to _Insurance Law § 5102(a)(1)_ and _11 N.Y.C.R.R. § 65-3.16(a)(12)_, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Northern Medical obtained Patients through an illegal kickback scheme (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Northern Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Northern Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 11.

750.     Northern Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Northern Medical since Northern Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Northern Medical to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Northern Medical to the present day.

751.     Northern Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE. These inherently unlawful acts are taken by Northern Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

752.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $222,437.00 pursuant to the fraudulent bills submitted by the Defendants through Northern Medical.

753.     ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

**FIFTY-THIRD CAUSE OF ACTION**
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

754.     ALLSTATE incorporates each allegation in the paragraphs set forth above.

755.     Northern Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

756.    Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Northern Medical enterprise.

757.    Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Northern Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Northern Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Northern Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Northern Medical obtained Patients through an illegal kickback scheme (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Northern Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Northern Medical's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 11.

163

758.     Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

759.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $222,437.00 pursuant to the fraudulent bills submitted by Defendants through Northern Medical.

760.     By reason of its injury, ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

**FIFTY-FOURTH CAUSE OF ACTION**
**Against Ahmed and Northern Medical**
**(Common Law Fraud)**

761.     ALLSTATE incorporates every allegation in the paragraphs set forth above.

762.     Ahmed and Northern Medical intentionally and knowingly made false statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

763.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Northern Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Northern Medical and Ahmed; (iii) in every claim, the

164

representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Northern Medical; and (iv) in every claim, the representation that the billed-for services were provided by employees of Northern Medical, when in fact many of the billed-for services were provided by independent contractors.

764.    Ahmed and Northern Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Northern Medical that were not compensable under the No-Fault Laws.

765.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $222,437.00 pursuant to the fraudulent bills submitted by Defendants through Northern Medical.

766.    Ahmed and Northern Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

767.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**FIFTY-FIFTH CAUSE OF ACTION**
**Against Ahmed and Northern Medical**
**(Unjust Enrichment)**

768.    ALLSTATE incorporates each allegation in the paragraphs set forth above.

769.    As set forth above, Ahmed and Northern Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

770.     When ALLSTATE paid the bills and charges submitted by or on behalf of Northern Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

771.     Ahmed and Northern Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

772.     Ahmed and Northern Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

773.     By reason of the above, Ahmed and Northern Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $222,437.00.

## FIFTY-SIXTH CAUSE OF ACTION
### Against the John and Jane Doe Defendants and ABC Clinics
### (Aiding and Abetting Fraud)

774.     ALLSTATE incorporates each allegation set forth above.

775.     The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Northern Medical.

776.     The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Northern Medical; (ii) knowingly referring Patients to Northern Medical in exchange for illegal kickbacks from Ahmed, Northern Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits without regard to Patient care.

777.     The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe

166

Defendants and ABC Clinics was a necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or Northern Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

778.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Northern Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

779.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $222,437.00 to Northern pursuant to the fraudulent bills submitted through Northern Medical.

780.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

781.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

### FIFTY-SEVENTH CAUSE OF ACTION
**Against Ahmed**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

782.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

783.    Boulevard Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

784.    Ahmed knowingly has conducted and/or participated, directly or indirectly, in the conduct of Boulevard Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the

United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Boulevard Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Boulevard Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Boulevard Medical obtained Patients through an illegal kickback scheme (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Boulevard Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Boulevard Medical's employees. The fraudulent billings and corresponding mailings submitted to ALLSTATE that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 11.

785.    Boulevard Medical's business is racketeering activity because the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Ahmed operated Boulevard Medical since Boulevard Medical never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Boulevard Medical to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the

fact that Defendants continue to attempt collection on the fraudulent billing submitted through Boulevard Medical to the present day.

786.   Boulevard Medical is engaged in inherently unlawful acts since it continues to attempt collection on fraudulent billing submitted to ALLSTATE. These inherently unlawful acts are taken by Boulevard Medical in pursuit of inherently unlawful goals – namely, the theft of money from ALLSTATE and other insurers through fraudulent no-fault billing.

787.   ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $17,332.00 pursuant to the fraudulent bills submitted by the Defendants through Boulevard Medical.

788.   ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

### FIFTY-EIGHTH CAUSE OF ACTION
**Against Ahmed and John and Jane Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

789.   ALLSTATE incorporates each allegation in the paragraphs set forth above.

790.   Boulevard Medical is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engaged in activities which affected interstate commerce.

791.   Ahmed and John and Jane Doe Defendants are employed by and/or associated with the Boulevard Medical enterprise.

792.   Ahmed and the John and Jane Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Boulevard Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341*, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two

169

years seeking payments that Boulevard Medical was not eligible to receive under the No-Fault Laws because: (i) in every claim, the representation that Boulevard Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed in that the billed-for-services were provided pursuant to the dictates of laypersons not licensed to render healthcare services and Boulevard Medical obtained Patients through an illegal kickback scheme (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Boulevard Medical obtained its Patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – if provided at all – by independent contractors, rather than by Boulevard Medical's employees. The fraudulent bills and corresponding mailings submitted to ALLSTATE that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit 11.

793.    Ahmed and the John and Jane Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud ALLSTATE and other insurers of money) by submitting or facilitating the submission of fraudulent charges to ALLSTATE.

794.    ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $17,332.00 pursuant to the fraudulent bills submitted by Defendants through Boulevard Medical.

170

795.    By reason of its injury, ALLSTATE is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)*, and any other relief the Court deems just and proper.

**FIFTY-NINTH CAUSE OF ACTION**
**Against Ahmed and Boulevard Medical**
**(Common Law Fraud)**

796.    ALLSTATE incorporates every allegation in the paragraphs set forth above.

797.    Ahmed and Boulevard Medical intentionally and knowingly made false statements of material fact to ALLSTATE and concealed material facts from ALLSTATE during their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

798.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Boulevard Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact it was not properly licensed and it obtained Patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Boulevard Medical and Ahmed; (iii) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Boulevard Medical; and (iv) in every claim, the representation that the billed-for services were provided by employees of Boulevard Medical, when in fact many of the billed-for services were provided by independent contractors.

171

799.     Ahmed and Boulevard Medical intentionally made the above-described false statements and concealed material facts in a calculated effort to induce ALLSTATE to pay charges submitted through Boulevard Medical that were not compensable under the No-Fault Laws.

800.     ALLSTATE has been injured in its business and property by reason of the above-described conduct in that it has paid at least $17,332.00 pursuant to the fraudulent bills submitted by Defendants through Boulevard Medical.

801.     Ahmed and Boulevard Medical's fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

802.     Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

**SIXTIETH CAUSE OF ACTION**
**Against Ahmed and Boulevard Medical**
**(Unjust Enrichment)**

803.     ALLSTATE incorporates each allegation in the paragraphs set forth above.

804.     As set forth above, Ahmed and Boulevard Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of ALLSTATE.

805.     When ALLSTATE paid the bills and charges submitted by or on behalf of Boulevard Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

806.     Ahmed and Boulevard Medical have been enriched at ALLSTATE's expense by ALLSTATE's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

807.     Ahmed and Boulevard Medical's retention of ALLSTATE's payments violates fundamental principles of justice, equity, and good conscience.

172

808.    By reason of the above, Ahmed and Boulevard Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than $17,332.00.

### SIXTY-FIRST CAUSE OF ACTION
**Against the John and Jane Doe Defendants and ABC Clinics**
**(Aiding and Abetting Fraud)**

809.    ALLSTATE incorporates each allegation set forth above.

810.    The John and Jane Doe Defendants and ABC Clinics knowingly aided and abetted the fraudulent scheme that was perpetrated on ALLSTATE by Ahmed and Boulevard Medical.

811.    The acts of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme included, among other things: (i) the operation and control of Boulevard Medical; (ii) knowingly referring Patients to Boulevard Medical in exchange for illegal kickbacks from Ahmed, Boulevard Medical and others; (iii) and knowingly participating and assisting in subjecting the Patients to a predetermined fraudulent treatment protocol to maximize profits without regard to Patient care.

812.    The conduct of the John and Jane Doe Defendants and ABC Clinics in furtherance of the fraudulent scheme was significant and material. The conduct of the John and Jane Doe Defendants and ABC Clinics was a necessary and critical to the success of the scheme because, without their actions, there would have been no opportunity for Ahmed or Boulevard Medical to obtain referrals of Patients at the Clinics, subject those Patients to medically unnecessary services, and obtain payment from ALLSTATE and other insurers for the Fraudulent Services.

813.    The John and Jane Doe Defendants and ABC Clinics aided and abetted the fraudulent scheme in a calculated effort to induce ALLSTATE into paying charges to Ahmed and Boulevard Medical for medically unnecessary, sham, and otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

173

814.    The conduct of the John and Jane Doe Defendants and ABC Clinics caused ALLSTATE to pay more than $17,332.00 to Boulevard Medical pursuant to the fraudulent bills submitted through Boulevard Medical.

815.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles ALLSTATE to recover punitive damages.

816.    Accordingly, by virtue of the foregoing, ALLSTATE is entitled to compensatory and punitive damages, with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

817.   Pursuant to *Federal Rule of Civil Procedure 38(b)*, ALLSTATE demands a trial by jury.

**WHEREFORE**, Plaintiff ALLSTATE demands that a Judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Defendants have no right to receive payment for any pending bills submitted to ALLSTATE;

B.    On the Second through Sixth Causes of Action against Ahmed and ENS Medical, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $156,284.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Seventh through Eleventh Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $239,859.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

174

D.       On the Twelfth through Seventeenth Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $180,049.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.       On the Eighteenth through Twenty-First Causes of Action against Ahmed and John and Jane Doe Defendants, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $125,418.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.       On the Twenty-Second through Twenty-Sixth Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $135,129.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.       On the Twenty-Seventh through Thirty-First Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $147,770.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.       On the Thirty-Second through Thirty-Sixth Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $442,027.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.       On the Thirty-Seventh through Forty-First Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess

175

of $19,941.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      J.      On the Forty-Second through the Forty-Sixth Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $114,334.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      K.      On the Forty-Seventh through Fifty-First Causes of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $130,479.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      L.      On the Fifty-Second through Fifty-Sixth Cause of Action against Ahmed, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $222,437.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      M.      On the Fifty-Seventh through Sixty-First Causes of Action against Ahmed and John and Jane Doe Defendants, compensatory damages in favor of ALLSTATE in an amount to be determined at trial but in excess of $17,332.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Dated: April, 26, 2024

**BRUNO, GERBINO & SORIANO & AITKEN, LLP**


By:    *Vincent F. Gerbino*
       VINCENT F. GERBINO
       *Attorneys for Plaintiff*
       445 Broad Hollow Road, Suite 420
       Melville, New York 11747-4712
       (631) 390-0010
       (631) 393-5497 – *facsimile*

177